**CONTRACTORS, LABORERS, TEAMSTERS AND ENGINEERS HEALTH & WELFARE PLAN; Contractors, Laborers, Teamsters and Engineers Pension Plan; Omaha-Council Bluffs Laborers Local # 1140 Holiday Trust; Laborers Training Fund; and Construction and General Laborers Union, Local No. 1140, Appellants,**

v.

**ASSOCIATED WRECKING COMPANY, a Nebraska Corporation, Appellee.**

No. 80–1191.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1980.

Decided Jan. 21, 1981.

David D. Weinberg, Weinberg & Weinberg, P. C., Malcolm D. Young, Duncan A. Young, Young & White, Omaha, Neb., for appellants.

Michael W. Heavey, Dwyer, O'Leary & Martin, P. C., Omaha, Neb., for appellee.

Before GIBSON, Senior Circuit Judge, HEANEY and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

This case presents an issue of first impression in this court in the labor relations field: whether the fringe benefit provisions of a prehire agreement, authorized by sec-

tion 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f) (1976), may be enforced against an employer even though the labor organization with which the employer executed the agreement never has achieved majority status among the employer's workers. The district court denied enforcement of the agreement. *Contractors, Laborers, Teamsters and Engineers Health & Welfare Plan v. Associated Wrecking Co.,* 484 F.Supp. 582 (D.Neb.1980).[1] We reverse.

I. *Background.*

On June 9, 1975, Omaha-Council Bluffs Local No. 1140 (Local 1140 or the Union) and Associated Wrecking & Salvage Company (Employer or the Company) executed a "participation agreement" in which the parties agreed to abide by the terms and provisions of several collective bargaining agreements reached by the Union with various contractors' associations operating in Omaha and Lincoln, Nebraska, and Council Bluffs, Iowa. The participation agreement required the Company to make contributions to the Contractors, Laborers, Teamsters and Engineers Health & Welfare Plan, the Omaha-Council Bluffs Laborers Local No. 1140 Holiday Trust, the Contractors, Laborers, Teamsters and Engineers Pension Plan, and the Laborers' Training Fund (collectively, the Trusts),[2] for each hour worked by employees of the Company on its projects. That agreement, which both the parties and the district court characterize as a "prehire agreement" within the meaning of section 8(f) of the Act, also bound the Employer to any amendments, modifications, or changes executed by the Union and the contractors' associations with respect to contributions to the Trusts.

---

1. Two federal district courts outside of this circuit have addressed the issue presented in this case, but only in summary fashion and with conflicting results. *See Washington Area Carpenters' Welfare Fund v. Overhead Door Co.,* 488 F.Supp. 816 (D.D.C.1980) (trust fund cannot sue employer to recover unpaid contributions required by prehire agreement absent proof of majority support for the union); *Eastern District Council v. Blake Construction Co.,* 457 F.Supp. 825 (E.D.Va.1978) (prehire agree-

ment for payment of fringe benefits was valid contract). Moreover, the *Overhead Door* court relied on the district court's decision in this case to reach its holding on the issue.

2. After executing the participation agreement, the Company and Local 1140 became signatory parties to the Trusts, which were organized pursuant to § 302 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 186 (1976).

On August 2, 1977, Local 1140 and the Trusts brought this action against the Company under section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185 (1976), seeking specific enforcement of the prehire agreement for contributions allegedly owed by the Company to the Trusts.[3] The Company moved for summary judgment on the ground that neither the Union nor the Trusts could enforce the agreement against the Company absent a showing that the Union ever had obtained majority support among the Company's employees. After determining as a matter of law that Local 1140 had never represented a majority of the Company's workers, the district court granted the Company's motion and dismissed the action.[4]

On appeal, the Union and the Trusts contend (1) that the absence of majority status does not preclude enforcement of the fringe benefit provisions of a prehire agreement; (2) that an employer may not assert a union's lack of majority support as a defense to an action by a trust fund to recover unpaid contributions required by a prehire agreement; and (3) that a prehire agreement, even in the absence of majority status, may be enforced against an employer until the employer takes affirmative steps to void the agreement. We agree with appellants' first contention and, therefore, need not address the remaining arguments.[5]

## II. Discussion.

Section 8(f) of the National Labor Relations Act permits an employer engaged in the building and construction industry to enter into a prehire agreement with a labor organization before the majority status of that organization has been established in accordance with the recognitional provisions of the Act. In pertinent part, section 8(f) provides:

(f) It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection 8(a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, * * * *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title. [29 U.S.C. § 158(f) (1976).]

Judge Gibbons aptly explained the genesis of this section in *NLRB v. Irvin*, 475 F.2d 1265, 1267 (3d Cir. 1973):

Section 8(f) was enacted as Section 705 of the Labor-Management Reporting and

---

**3.** The Union and the Trusts originally filed their complaint against Robert Hrock, d/b/a Associated Wrecking Company, but upon stipulation of the parties the district court substituted Associated Wrecking & Salvage Company as the party-defendant.

**4.** The district court summarized its determination as follows:

Turning to the record in this case, it is clear that the plaintiffs have failed to make the requisite showing. The uncontroverted affidavit of Robert Hrock, the defendant's president, indicates that, while the defendant has employed some employees of the type covered by the collective bargaining agreements referred to in the § 8(f) agreement here in question, at no time have a majority of such employees elected or chosen the plaintiff un-

ion to act as their collective bargaining representative. This being the case, the Court finds, in light of the *Local 103* decision [*NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335 [98 S.Ct. 651, 54 L.Ed.2d 586] (1978)], that the § 8(f) agreement in question is unenforceable against the defendant and that the defendant is entitled to summary judgment. [*Contractors, Laborers, Teamsters and Engineers Health & Welfare Plan v. Associated Wrecking Co.*, *supra*, 484 F.Supp. at 587.]

**5.** As to appellants' last contention, *see Florida Marble Polishers Health and Welfare Trust Fund v. Megahee*, 102 L.R.R.M. 2740, 2741 (1979).

Disclosure Act of 1959, Pub.L. No. 86–257, 73 Stat. 519. It amended Section 8 of the National Labor Relations Act by adding a new subsection, applicable to the construction industry, providing among other things that it would not be, as it would otherwise have been, an unfair labor practice for an employer engaged primarily in that industry, to make a collective bargaining agreement with a labor organization covering its employees prior to the time the majority status of that labor organization had been established in a manner authorized by Section 9 of the Act, 29 U.S.C. § 159. The amendment was adopted to meet specific problems which had arisen in the construction industry under the prior law because of the transitory nature of the employer-employee relationship in that industry. During the Wagner Act period the Board had declined to exercise jurisdiction over the industry. In 1947, after passage of the Taft-Hartley amendments, the Board applied the provisions of the Act to the industry with consequent difficulties. These difficulties are discussed in Senate Report No. 187, House Report No. 741, and Conference Report No. 1147, 86th Cong., 1st Sess. (1959). 1959 U.S.Code Cong. & Ad.News, 86th Cong., 1st Sess. 2318, 2344, 2441, 2513. In summary, pre-hire agreements which would otherwise be invalid were authorized in the construction industry because of the dual necessities (1) that construction bidders know in advance of bid what their labor costs would be, and (2) that construction employers have access to an available pool of skilled craftsmen for quick reference.

The Supreme Court has addressed the provisions of section 8(f) indirectly in *Retail Clerks Int'l Ass'n, Local Unions Nos. 128*

*and 633 v. Lion Dry Goods, Inc.*, 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962), and directly, but in a context different from the instant litigation, in *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978).

In *Lion Dry Goods*, the Court determined that section 301(a) of the Act, which confers on federal district courts jurisdiction over suits for violation of "contracts" between an employer and a labor organization, encompasses a suit to enforce a strike settlement agreement between an employer and a local labor union representing some, but not a majority, of its employees. In that case, the district court had reached a contrary conclusion that to come within the ambit of section 301(a), the contract must constitute a collective bargaining agreement between an employer and the majority representative of the employees. 369 U.S. at 24–25, 82 S.Ct. at 546. In rejecting this construction of section 301(a), the Court supported its holding by referring to the enactment of section 8(f):

> A 1959 enactment, § 8(f), explicitly contemplates contracts that would not fit respondents' concept of "collective bargaining agreements." It authorizes contracting with unions that represent persons not yet even hired by the employer. Such a contract might cover only hiring procedures and not wages, hours, and conditions of employment. Nothing supports the improbable congressional intent that the federal courts be closed to such contracts. [*Id.* at 27, 82 S.Ct. at 547 (footnote omitted).]

Subsequently in *Local 103*, the Court reviewed an unfair labor practice decision of the National Labor Relations Board construing the relationship between sections 8(f) and 8(b)(7)(C) of the Act.[6] In that case,

---

**6.** Section 8(b)(7)(C) of the National Labor Relations Act makes it an unfair labor practice for a labor organization

to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the repre-

sentative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
* * * *

Higdon Construction Company and Local 103 had entered into a prehire agreement whereby the company agreed to be bound by the terms of a contract between the union and a multiemployer association. Shortly after executing the agreement, the sole stockholder of the company formed an alter ego corporation for the express purpose of avoiding the prehire and multiemployer agreements and hired nonunion labor to work on its projects. When Local 103 learned of the second company, it picketed two of the company's projects where the union did not represent a majority of the employees. The Board determined that it is an unfair labor practice within the meaning of section 8(b)(7)(C) for an uncertified union, not representing a majority of the employees, to engage in extended picketing in an effort to enforce a prehire agreement with an employer. In upholding the Board's determination, the Court commented: [7]

> [A] prehire agreement does not entitle a minority union to be treated as the majority representative of the employees until and unless it attains majority support in the relevant unit. Until that time the prehire agreement is voidable and does not have the same stature as a collective-bargaining contract entered into with a union actually representing a majority of the employees and recognized as such by the employer. [434 U.S. at 341, 98 S.Ct. at 655.]

> (C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing. * * *.

7. In holding that § 8(f) does not confer a right to enforce a prehire contract by picketing, the Court also discussed its decision in *Lion Dry Goods*:

> The union argues that the Board's position permitting an employer to repudiate a prehire agreement until the union attains majority support renders the contract for all practical purposes unenforceable, assertedly contrary to this court's decision in *Retail Clerks v. Lion Dry Goods, Inc.*, 369 U.S. 17 [82 S.Ct. 541, 7 L.Ed.2d 503] (1962). There, the Court's opinion recognized that § 301 of the Labor Management Relations Act confers

The district court in this litigation considered *Local 103* as dispositive of appellants' action against the Company. As explained by the court,

> [I]n light of the Supreme Court's decision in *Local 103*, it is clear that a § 8(f) agreement cannot be enforced, and can be unilaterally ignored or abrogated by the employer, until such time as the union achieves majority status in the relevant unit. While § 8(f) permits an employer in the construction industry to execute an agreement with a union which has not yet achieved majority status, such agreement, as viewed by the Board, "is merely a preliminary step that contemplates further action for the development of a full bargaining relationship." *Ruttmann Construction Co.*, 191 NLRB 701, 702 (1971). The employer's duty to honor the § 8(f) agreement is still contingent upon the union achieving majority support at the various construction sites. *NLRB v. Iron Workers, Local 103, supra*, 434 U.S. at 345, 98 S.Ct. at 657. [484 F.Supp. at 585.]

Several aspects of the *Local 103* opinion convince us, however, that the Supreme Court's decision does not control the outcome of this case.

Initially, the broad language of *Local 103* upon which the district court relied must be read in light of the specific issue before the Court. As stated in the majority opinion,

> jurisdiction on the federal courts to entertain suits on contracts between an employer and a minority union, as well as those with majority-designated collective-bargaining agents. Section 8(f) contracts were noted as being in this category. The Court was nevertheless speaking to an issue of jurisdiction. That a court has jurisdiction to consider a suit on a particular contract does not suggest that the contract is enforceable. It would not be inconsistent with *Lion Dry Goods* for a court to hold that the union's majority standing is subject to litigation in a § 301 suit to enforce a § 8(f) contract, just as it is in a § 8(a)(5) unfair labor practice proceeding, and that absent a showing that the union is the majority's chosen instrument, the contract is unenforceable. [434 U.S. at 351-52, 98 S.Ct. 660-61.]

[t]he Board and the Court of Appeals thus differ principally on the legal questions of how § 8(f) is to be construed and of what consequences the execution of a prehire agreement has on the enforcement of other sections of the Act, primarily §§ 8(a)(5) and 8(b)(7)(C). [434 U.S. at 341, 98 S.Ct. at 656.]

On this issue, the Court deferred to the Board's view of the relationship between sections 8(f) and 8(b)(7)(C) as "although perhaps not the only tenable one, * * * an acceptable reading of the statutory language and a reasonable implementation of the purposes of the relevant statutory sections." *Id.* at 341, 98 S.Ct. at 656 (footnote omitted). Thus, the Court did not purport to decide the enforceability of all section 8(f) agreements but only those which implicated the provisions of section 8(b)(7)(C). *Accord, Eastern District Council v. Blake Construction Co., supra*, 457 F.Supp. at 829 ("[*Local 103*] dealt with the question of whether certain picketing was an unlawful labor practice and is not determinative on the facts of this case.").

Second, the Court's holding arose in the context of an unfair labor practice proceeding, not in a breach of contract action. *Local 103* held that an employer does not commit an *unfair labor practice* for breach of its duty to bargain by unilaterally abrogating a prehire agreement with a labor union that never obtains majority support from the employees in the bargaining unit. It does not necessarily follow, however, that the absence of majority status leaves the union without a remedy for *breach of contract* on any provision of the section 8(f) agreement. To say that an employer may challenge the majority status of a union in an unfair labor practice proceeding is not to say that the employer may assert the union's lack of majority status as a defense in a breach of contract action on a type of contract specifically authorized by the Act.

Third, the Court's deference to the Board's view in *Local 103* rested on the generally prevailing statutory policy that employees remain free to make an uncoerced choice of their bargaining agent. The unrestricted use of picketing as an organizational technique, the Court observed, was of particular concern to Congress in adopting section 8(b)(7)(C) because of its potential for interfering with employees' freedom of choice through an economic sanction generally reserved for unions enjoying majority status.[8] Thus, the Court concluded, to countenance the use of picketing under the guise of securing compliance with a prehire agreement would allow a labor organization to accomplish through the back door by way of section 8(f) what it could not lawfully do at the front door under section 8(b)(7)(C). 434 U.S. at 346, 98 S.Ct. at 658, (picketing to enforce the section 8(f) contract would be the "legal equivalent" of picketing to require recognition as the exclusive bargaining agent).

In the present litigation, however, the spector of an unfair labor practice does not loom as a countervailing consideration to the enforcement of the parties' section 8(f) agreement. Appellants seek to enforce an agreement voluntarily undertaken by an employer for the payment of fringe benefits into trust funds. Those payments inure to the benefit of the individual employees at the time of employment, regardless of the majority status of the union. This situation contrasts markedly with that in *Local*

---

8. As we explained in *NLRB v. IBEW, Local 265*, 604 F.2d 1091 (8th Cir. 1979),

> Congress enacted § 8(b)(7) as a corollary to the federal policy of ensuring employees a free choice in the selection of a bargaining representative. Prior to the 1959 amendments, a union could lawfully picket an employer for an unlimited length of time, either to compel the employer to recognize it as the bargaining representative of his employees or to force the employees to select it as their representative. Section 8(b)(7)(C) removes these threats by encouraging prompt resort to the Board's election process and by discouraging the economic pressures of picketing as the vehicle to resolve questions of representation. Consequently, § 8(b)(7)(C) makes it an unfair labor practice for an uncertified labor organization to picket an employer for more than thirty days if the picketing has a recognitional or organizational objective, and the union fails to file a § 9(c) election petition within thirty days of its commencement. [*Id.* at 1096–97 (citations omitted).]

*103* where the union sought to enforce an 8(f) agreement for its benefit in an effort to obtain majority status.

Moreover, a prehire agreement benefits employers as well as employees. Construction bidders can know their labor costs in advance of their bids and the successful bidders have access to a readily available pool of skilled craftsmen. *NLRB v. Irvin, supra,* 475 F.2d at 1267. Execution of the prehire agreement also guarantees industrial peace at the employer's worksite for the duration of the parties' understanding. *NLRB v. Haberman Construction Co.,* 618 F.2d 288, 312 (5th Cir. 1980), *rehearing en banc granted,* 618 F.2d 319 (July 15, 1980). Thus, the benefits of a prehire agreement for fringe benefits do not travel down a one-way street. An employer who accepts the benefits of such an agreement must also honor its obligations under that agreement.

Finally, a union has a judicially recognized interest in maintaining area standards of employment, regardless of whether the union holds majority status or whether the employer is a party to a collective bargaining agreement with the union. *See Congress of Independent Unions v. NLRB,* 620 F.2d 172, 176 (8th Cir. 1980); *NLRB v. IBEW, supra,* 604 F.2d at 1097; *San Francisco Local Joint Executive Board v. NLRB,* 501 F.2d 794, 799 (D.C.Cir.1974). That interest should permit a union under section 8(f) to contract with a nonunion employer for the payment of prevailing area benefit standards and to sue upon that agreement should the employer breach its obligation.

Accordingly, we find no sanction in the Supreme Court's decision in *Local 103* or the policies underlying section 8(f) for permitting an employer to unilaterally abrogate a validly executed prehire agreement on fringe benefits even though the union has not achieved majority status. Because the absence of majority status does not constitute a per se bar to an action for breach of a section 8(f) agreement, Local 1140 and the Trusts, to the extent of their interests, may seek enforcement of their agreement with the Company. Our decision does not reach any question concerning the interpretation, application, or duration of the parties' agreement, but leaves these matters for the district court to determine on remand.

Reversed and remanded to the district court for further proceedings consistent with this opinion.