Frank L. TODD, et al.,
Plaintiffs-Appellees,

v.

JIM McNEFF, INC., a California corporation, Defendant-Appellant.

No. 80–5214.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 1981.

Decided Feb. 8, 1982.

Steven D. Atkinson, Atkinson, Andelson, Rudd & Romo, Huntington Beach, Cal., for defendant-appellant.

Wayne Jett, Los Angeles, Cal., for plaintiffs-appellees.

Before TANG and BOOCHEVER, Circuit Judges, and NIELSEN,* District Judge.

NIELSEN, District Judge:

This case arises under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Trustees of certain trust funds created pursuant to 29 U.S.C. § 186(c), filed this action to recover fringe benefit contributions allegedly due and owing by the terms of a collective bargaining agreement. The following facts are uncontroverted in the record.

On September 13, 1978, Jim McNeff, Inc. (McNeff, Inc.) was employed as a subcontractor on a jobsite. Jim McNeff, President of McNeff, Inc. was approached by a union representative who informed him that he would have to sign the Master Labor Agreement for the Union (International Union of Operating Engineers, Local No. 12) or leave the job. When Jim McNeff refused, the representative left and returned with the prime contractor, who also informed McNeff that he would have to sign the Agreement if he wanted to continue on the site. McNeff then signed the Agreement, although he claims he has never read it, nor did he ever intend to abide by its terms. At that time, McNeff, Inc. employed three workers. All signed union representative cards the same day.

According to the terms of the Agreement, McNeff, Inc. was required to make contributions to the trust fund for each covered employee. Each month from October, 1978, through March, 1979, McNeff, Inc. submitted to appellees a report stating that "no members of this craft were employed during the month," and remitting no contributions. In November, 1978, trustees asked permission to audit the company's records. After several postponements due to appellant's requests, on April 4, 1979, this action was filed. When the audit was carried out, the trustees found that covered employees had in fact been employed, and that contributions in the amount of $5,316.79 were due under the terms of the contract for five employees that had been employed prior to the filing of the suit.

The trustees also filed unfair labor practice charges with the N.L.R.B. The General Counsel declined to prosecute the case on the ground that a full collective bargaining relationship had never been established.

In the District Court, the Court granted summary judgment for the trustees, and McNeff, Inc. has appealed.

The labor contract in this case is one under Section 8(f) of the National Labor Relations Act (29 U.S.C. § 158[f] ). This section is an exception to the general labor

---

* Honorable Leland C. Nielsen, United States District Judge for the Southern District of California, sitting by designation.

policy that an employer can only enter into a collective bargaining relationship with a union that represents a majority of the employer's employees. As jobs begin and end, construction workers frequently change employers. Due to this, Congress has seen fit to allow so-called "pre-hire" agreements in that industry. These agreements may be signed before the union represents a majority of the employer's employees, and may continue in duration through more than one of the employer's jobs, even if the employer goes through a high employee turnover. These agreements allow the employees some of the wage and benefit advantages of union representation, as well as relative wage stability. The employer is assured a qualified pool of workers to choose from when it needs them, protection against labor unrest during the period of the contract, and predictable labor costs, an invaluable tool in the bidding process.

■ The major issue in this case is the enforceability of these pre-hire agreements. Although these agreements are legal by virtue of § 8(f), they do not mature into full collective bargaining agreements until the union has actually succeeded in convincing a majority of the employer's employees to be represented by the union. *Ruttman Construction Company*, 191 N.L.R.B. 701, 702 (1971). The Supreme Court approved this position in *N.L.R.B. v. Local Union No. 103, Iron Workers (Higdon Construction Company)*, 434 U.S. 335, 345, 98 S.Ct. 651, 657, 54 L.Ed. 586 (1978). In *Higdon*, the employer refused to abide by the terms of a pre-hire agreement on one of its jobs, and the union picketed the jobsite for more than 30 days. The employer filed unfair labor practice charges with the N.L.R.B. under § 8(b)(7)(C) of the N.L.R.A., which forbids picketing by a union which is not the authorized bargaining representative unless the union petitions the Board for a representation election within 30 days. The Supreme Court reversed the Circuit Court and reinstated the N.L.R.B. decision that the picketing was in fact an unfair labor practice. The Court held that a § 8(f) pre-hire agreement is only a preliminary step in the creation of a collective bargaining relationship,

and that the relationship only matures at such time as the union achieves majority status. Until then, the contract is voidable. 434 U.S. at 341, 98 S.Ct. at 655. Since the *Higdon* decision, the lower federal courts have split into three groups on the issue of what is the correct interpretation of the Supreme Court's statement that these contracts are voidable.

The most restrictive reading of *Higdon* is that it was only intended to deal with the interface between § 8(f) and § 8(b)(7). Under this view, *Higdon* is only applicable to unfair labor practice cases, and in cases such as this one, brought by trustees of fringe benefit funds for back payments, § 8(f) agreements are fully enforceable under all circumstances. Heavy reliance is placed upon *Lewis v. Benedict Coal Corporation*, 361 U.S. 459, 80 S.Ct. 489, 41 L.Ed.2d 442 (1960) by the courts that have adopted this approach. In *Benedict*, the Supreme Court held that a contract to pay contributions to a union pension fund was not a typical third-party beneficiary contract, in that the employer could not assert the union's breach of contract as a defense in an action by the trustees. The courts which have interpreted *Higdon* in this narrow manner do so by analogy to *Benedict*, limiting in another way the employer's right to challenge the enforceability of an agreement to make fringe-benefit contributions on a suit by the trustees.

The following courts have adopted this reasoning: The Eighth Circuit, *Contractors, Laborers, Teamsters and Engineers Health & Welfare Plan v. Associated Wrecking Co.*, 638 F.2d 1128 (8 Cir. 1981); the Tenth Circuit, *New Mexico District Council of Carpenters v. The Mayhew Co.*, 664 F.2d 215 (10 Cir. 1981); the Eastern District of Virginia, *Eastern District Council of Carpenters v. Blake Construction Co.*, 457 F.Supp. 825 (1978); and the State of Washington Court of Appeals, *Western Washington Cement Masons Health & Security Trust Funds v. Hillis Homes*, 26 Wash.App. 224, 612 P.2d 436 (1980).

The middle position relies upon the use of the word "voidable" in the *Higdon* opinion. According to this interpretation, an employer is able to exercise the right of repudiation until the union achieves majority status. A pre-hire agreement would therefore be fully enforceable until a repudiation, and trustees could recover in a § 301 action contributions accruing prior to the repudiation.

The Eighth Circuit apparently reconsidered the restrictive position taken in *Associated Wrecking,* and adopted this approach in *W. C. James, Inc. v. Oil, Chemical, and Atomic Workers International Union,* 646 F.2d 1292 (8 Cir. 1981). The Middle District of Florida also espouses this view. *Florida Marble Polishers Health & Welfare Trust Fund v. Megahee,* 102 L.R.R.M. 2740 (1979).

In addition, two other courts, while rejecting the third interpretation, have found it unnecessary to choose between these first two. *Trustees of the Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Co.,* 509 F.Supp. 1097 (N.D.Ga.1981); *Western Washington Laborers-Employers Health & Security Trust Fund v. Newman,* 90 C.C.H. Labor Cases ¶ 12,379 (W.D.Wash. 1980).

The final view that some courts have taken on this question is that until the union affirmatively demonstrates majority status no contract has been formed, and a repudiation voids the contract *ab initio.* Some language in *Ruttman, supra,* and the N.L.R.B. *Higdon* decision (*Iron Workers Local 103 [Higdon Construction Co.],* 88 L.R.R.M. 1067 [1975]) supports this view.

The courts which have taken this stance are a different judge in the Western District of Washington, *Western Washington Laborers-Employers Health & Security Trust Fund v. McDowell,* 103 L.R.R.M. 2219 (1979); the District of Oregon, *Vermeer v. Aloha Contractors,* 90 C.C.H. Labor Cases ¶ 12,466 (1980); and the District of the District of Columbia, *Washington Area Carpenters Welfare Fund v. Overhead Door Co.,* 488 F.Supp. 816 (1980).

The Fifth Circuit also refused to enforce a pre-hire agreement prior to a demonstration of majority support. *Baton Rouge Building and Construction Trades Council v. E. C. Shafer Construction Co.,* 657 F.2d 806 (5 Cir. 1981).

We hold that the middle ground, requiring repudiation by the employer in order to avoid the pre-hire agreement, is both the best interpretation of *Higdon* and the best implementation of the national labor policies. There is no reason to restrict the statements in *Higdon* about § 8(f) agreements generally to unfair labor practice cases. The opinion is written much more broadly than that view allows. Moreover, the N.L.R.B. *Higdon* opinion is written even more broadly, and the Supreme Court's stated reason for reinstating the N.L.R.B. opinion was that the courts should defer to the Board when it has made an acceptable reading of the statutory language. 434 U.S. at 341, 98 S.Ct. at 655.

By the same token, it goes too far to hold these contracts unenforceable without a repudiation. The Supreme Court used the word "voidable", not "void" in *Higdon.* 434 U.S. at 341, 98 S.Ct. at 655. At least some members of Congress have criticized *Overhead Door, McDowell,* and this interpretation generally. 126 Cong.Rec. H7899 (August 26, 1980) (remarks of Rep. Thompson). To hold that no contract has been formed also allows employers to enjoy the benefits of a pre-hire agreement, then later repudiate and completely avoid their own contractual obligations.

On the other hand, allowing a repudiation by the employer, but enforcing the contract until that repudiation occurs seems a correct reading of *Higdon.* A minority union will not be able to control an employment situation, because an employer can repudiate. Employers will be prevented from misleading unions into believing they intend to perform their contractual duties. Thus pre-hire agreements will be available to fill the void in the construction industry without allowing minority unions inappropriate leverage in this collective bargaining context.

On balance, therefore, both from a policy standpoint and as a matter of interpretation of the Supreme Court's mandate, we find that § 8(f) pre-hire contracts are

voidable by the employer until the union attains majority support. Until such a repudiation, however, the contract is fully enforceable in action under § 301 of the L.M.R.A.

McNeff, Inc. has argued that this holding creates a conflict in the law, since it will require the District Courts to make determinations regarding the majority status of a union at different times once it has made the finding that there has been a repudiation. It cites *South Prairie Construction Co. v. Local 627, International Union of Operating Engineers (Peter Kiewit)*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) for the proposition that these determinations are solely the province of the N.L.R.B. *Peter Kiewit* is, however, not controlling here. The Board has expertise in determining the majority status of a union at any given time. It has no apparatus for determining a union's past status. If there has been a repudiation, the crucial question is whether the union had previously attained majority status. Re-creation of past relationships for the purpose of resolving factual disputes is one of the traditional functions of a trial court, and not a process in which the N.L.R.B. has any extraordinary expertise. Therefore, in this opinion we do not extend the District Court's jurisdiction into an area in which the N.L.R.B. exercises exclusive authority.

■ We need not resolve this issue, however, because it is clear that in this case the employer never repudiated the contract. The only act in the record which could possibly be argued to be a repudiation is the employer's failure to perform its contractual obligations. While it is clear that in some circumstances noncompliance can be so bald as to put the union on notice of the employer's intent to repudiate (*see*, e.g. *Higdon*, 88 L.R.R.M. 1067), the behavior here falls short. It is precisely this sort of action by an employer, enjoying the benefits of a pre-hire agreement and misleading the union as to the employer's intention of never performing its obligations, which has led us to adopt this view of the voidability of these contracts. There has been no repudiation, and this contract was enforceable for the period covered by the complaint.

■ McNeff, Inc. finally argues that there was no contract since it was coerced into signing the Master Labor Agreement. Appellant cites *Higdon*, 434 U.S. at 348, n. 10, 98 S.Ct. at 659, for the proposition that only pre-hire agreements which have been voluntarily entered into can be enforced. We need not decide here whether the union's tactics amounted to coercion, because the employer has raised this issue in the wrong way. The employer's remedy in the case of a coerced pre-hire agreement is the same as that for a minority union agreement. It must repudiate. To allow the employer to raise the issue of coercion now would be to do what we have just refused to do—allow the employer to enjoy the fruits of a pre-hire agreement and then challenge it. Thus, if a § 8(f) agreement has been signed under coercion, it is still enforceable up to the time it is repudiated.

By the above analysis, the contract was fully enforceable up to the time the suit was filed. McNeff, Inc. must fulfill its contractual obligations, and the District Court's grant of summary judgment for the trustees is AFFIRMED.