**The CARPENTERS AMENDED AND RESTATED HEALTH BENEFIT FUND, and its Trustees; the North Texas Carpenters Apprentice and Training Fund, and its Trustees; the North Texas Carpenters Amended and Restated Pension Trust, and its Trustees, Plaintiffs,**

v.

**COPE & SMITH, INC., Defendants.**

**Civ. A. No. CA–3–81–0118–D.**

United States District Court,
N. D. Texas,
Dallas Division.

July 8, 1982.

Jerry L. Carlton, Dallas, Tex., for plaintiffs.

Steven M. Carsey, Fort Worth, Tex., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT M. HILL, District Judge.

This action having been heard by the Court without a jury, the Court hereby makes the following findings of fact and conclusions of law.

*Findings of Fact*

1. Plaintiffs, Carpenters Amended and Restated Health Benefit Fund ("the Trustees"), have brought this action pursuant to § 301 of the Labor Management Relations Act of 1947 ("LMRA"), as amended, 29 U.S.C. § 185(a), and § 502(e) of the Employees Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(e).

2. This action arises out of a short form agreement entered into in 1972 by Defendant Cope & Smith ("the Employer") and the Carpenters District Council of North Central Texas, United Brotherhood of Carpenters & Joiners of America ("CDC"). Pursuant to this short form agreement, the Employer, who performs construction contracts as a general contractor, agreed to abide by the terms of a collective bargaining agreement between the North Texas Contractors Association ("NTCA") and the CDC. The Employer agreed to pay stipulated rates per hour for each hour worked by certain employees covered by the agreement and contribute to certain welfare funds, including a Health and Welfare Fund, an Apprenticeship Contribution Fund, and a Pension Fund. The collective bargaining agreement covered employees, union and non-union, who performed "carpenters" work within specified geographical areas.

3. The Employer entered into the 1972 short form agreement because representatives of the CDC threatened to shut down one of the Employer's jobsites if the Employer did not sign.

4. The Employer did not read the contents of the collective bargaining agreement prior to the institution of this lawsuit. It was the usual practice of the CDC to send to an employer copies of any collective bargaining agreement entered into by the CDC and NTCA.

5. At the time the Employer executed the 1972 short form agreement, it had an unstable work force consisting primarily of laborers or carpenters hired to work on a specific job rather than employees who were kept on the Employer's payroll and assigned to different jobs as they became available.

6. The Trustees failed to establish that a majority of the Employer's carpenter employees were represented by or sought to be represented by the carpenters' union, the CDC, at any time between 1972 and 1980.

7. The Employer never assigned its bargaining rights to the NTCA as a multi-employer bargaining representative on behalf of the Employer for purposes of dealing with the CDC.

8. The termination clause of the 1972 short form agreement provides in relevant part:

> In the event that either party to this Agreement desires to cancel this Agreement at its expiration, it is agreed that such party shall notify the other party in writing not less than ninety (90) days prior to the expiration date. If such notice is not given by either party as outlined, this Agreement shall remain in force from year to year and shall be subject to the terms and agreements as negotiated with the North Texas Contractors Association.

9. The collective bargaining agreement between the CDC and NTCA, as referenced in the 1972 short form agreement, was by its own terms effective through April 30, 1973. Subsequent collective bargaining agreements were executed for 1973–75, 1975–78, and 1978–81.

10. In 1975, the members of the Carpenters Union went on strike. Without signing any collective bargaining agreement, the Employer agreed to abide by the wages to be established in the forthcoming 1975 collective bargaining agreement between the NTCA and the CDC. The Employer made this agreement with the CDC representative in order to prevent a disruption in work by union employees who would otherwise strike on the Employer's jobsite. The Employer also agreed to pay retroactively the wages and benefits agreed upon in the 1975 collective bargaining agreement.

11. Prior to the execution of the 1972 short form agreement, the Employer made contributions of health and pension benefits on behalf of its union employees. These

funds, however, were not paid to the Trustees in this action.

12. After the execution of the 1972 short form agreement, the Employer made contributions to the Trustees' funds on behalf of its employees who were members of the carpenters' union. The Trustees demonstrated that the Employer filed reports indicating it made contributions from January 1974– May 1978 on behalf of its carpenters who were union employees. In addition, the Employer made the following certification in its 1974–78 contributions report:

We certify that to the best of our knowledge and belief this report is a true and complete report of the hours worked by employees represented in collective bargaining by the Local Union shown above and such other employees as may be approved by the Board of Trustees but in no event includes any other employees, owners, partners, or proprietors of this form. We hereby adopt the Texas Carpenters Health Benefit Fund, agree to be bound by all the terms, provisions, limitations and conditions of said Trust, agree that Employer Trustees appointed under the Trust shall represent the undersigned, and agree to contribute the sums stipulated in the Agreement for each hour worked by carpenters who are employed by the undersigned and represented in collective bargaining by a Local Union for payroll time accumulated within the territorial jurisdiction of the Local from this date until expiration of the contract.

13. The Employer has never made contributions on behalf of its non-union employees.

14. The Employer took into account the fact that it did not make contributions for non-union carpenters when it bid jobs in 1978–80. It has calculated its costs of labor and profit margins on contracts it has performed without including the extra costs associated with the trust fund contributions in behalf of non-union employees.

15. After May 1978, the Employer continued to make contributions on behalf of its union employees, but the Employer paid the contributions directly to some of its union employees. The direct payments were the result of certain agreements entered into by the Employer and these employees.

16. The Trustees seek to recover from the Employer unpaid contributions for the period between January 1, 1978—December 31, 1980, together with interest thereon, audit fees and attorneys' fees.

17. As part of its regular business procedures, the CDC keeps records of various employers who are late in making trust fund contributions to the CDC. Part of the CDC's information is derived from stewards who are present at all times on contractors' job sites; the stewards maintain records of all employees on a particular job site. The steward then submits the list of employees to the CDC, and the CDC checks the steward's list against the CDC's records of contributions paid by the employer. Any discrepancy with respect to employees and specifically non-union employees whose names do not appear on both the steward's and CDC's lists will result in a CDC audit.

### Conclusions of Law

1. The Court has jurisdiction of this action pursuant to § 301 of the LMRA, 29 U.S.C. § 185(a) and § 502(e) of the ERISA, 29 U.S.C. § 1132(e).

2. The Trustees are parties in interest and fiduciaries within the meaning of ERISA, 29 U.S.C. § 1002. The Trustees are third party beneficiaries to the 1972 short form agreement. *See Huge v. Long's Hauling Co., Inc.,* 590 F.2d 457, 459 (3d Cir. 1978), *cert. denied,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979).

3. The Employer was and is an employer in an industry affecting commerce and a party in interest within the meaning of ERISA, 29 U.S.C. §§ 1002, 1132.

4. The Employer's principal defense rests on the contention that the 1972 short form agreement and its referenced collective bargaining agreement(s) constitute an unenforceable prehire agreement. Section 8(f) of the National Labor Relations

Act ("NLRA"), 29 U.S.C. § 158(f) [1] permits an employer in the construction industry to negotiate a collective bargaining agreement with a labor organization before the organization establishes majority status pursuant to § 9 of the NLRA, 29 U.S.C. § 159. Section 8(f) is an exception to the national labor law scheme which requires that a labor organization be designated or selected for the purposes of collective bargaining by a majority of the employees in the unit the organization seeks to represent; thus, an employer may not bargain or enter into a collective bargaining agreement with a minority union, even if the parties in good faith believe that the union represents a majority of the employees. *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 738–39, 81 S.Ct. 1603, 1607–08, 6 L.Ed.2d 762 (1961). Congress acknowledged that an exception was necessary for the construction industry, because the short periods of actual employment by specific employers inherent in the construction industry make impracticable representation elections. *Todd v. Jim McNeff, Inc.*, 667 F.2d 800, 802 (9th Cir. 1982); *Trustees of Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Co.*, 509 F.Supp. 1097, 1101–02 (N.D.Ga.1981). The prehire agreement established by § 8(f) was enacted to accommodate the needs of the employer, the employee, and the union, and it may be signed before a majority of workers selects its union representative. The prehire agreement assures the employer it will have a qualified pool of skilled workers when they are needed and it aids the employer in construction bidding since the agreement is a useful tool in predicting labor costs. *Todd*, 667 F.2d at 802; *Southern Stress*, 509 F.Supp. at 1102. In addition, the prehire agreement allows the workers some of the wage and benefit advantages of union representation, together with relative wage stability. *Todd*, 667 F.2d at 802.

5. The Supreme Court recently considered the enforceability of prehire agreements in *N.L.R.B. v. Local Union No. 103, Iron Workers ("Higdon")*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). In *Higdon*, a construction company which had executed a prehire agreement with the union undertook a construction project through an alter ego company with nonunion labor. The union picketed the jobsite although it had not petitioned for a representative election within 30 days of the commencement of the picketing. The Supreme Court held that an uncertified union not representing a majority of workers commits an unfair labor practice under § 8(b)(7)(C) of the NLRA, 29 U.S.C. § 158(b)(7)(C), by engaging in extended picketing to enforce the prehire agreement, for the object of the union's picketing reflected an attempt to gain recognition as the workers' bargaining representative. In so holding, the Supreme Court adopted the National Labor Relations Board's construction of a prehire agreement: a prehire agreement is a voidable contract which does not entitle a minority union to be treated as the majority representative unless and until it attains majority support in the relevant employee unit. *Id.* at 341, 98 S.Ct. at 655.

6. The *Higdon* decision has spawned a great deal of controversy with respect to the enforceability of prehire agreements. The *Todd* court, 667 F.2d at 802–03, recapitulated the three views followed by the lower federal courts in the wake of the *Higdon*

1. Section 8(f) of the NLRA provides in relevant part:

It shall not be an unfair labor practice under subsection (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement .... Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

Court's reference to prehire agreements as "voidable." The most restrictive interpretation, *Todd*, 667 F.2d at 802, is that *Higdon* only addressed the relationship between § 8(f) and § 8(b)(7). According to this view, *Higdon* applies solely to unfair labor practice cases, *New Mexico Dist. Council of Carpenters v. Mayhew Co.*, 664 F.2d 215 (10th Cir. 1981); *Contractors, Laborers, Teamsters and Engineers Health & Welfare Plan v. Associated Wrecking Co.*, 638 F.2d 1128 (8th Cir. 1981); *cf. W. C. James, Inc. v. Oil, Chemical & Atomic Workers Int'l Union*, 646 F.2d 1292 (8th Cir. 1981), and may not govern suits brought by trustees of fringe benefit funds for back payments. *Associated Wrecking*, 638 F.2d 1128. The "middle position," *Todd*, 667 F.2d at 803, is based on the premise that an employer is able to exercise the right of repudiation until the union achieves majority status. The prehire agreement is fully enforceable until repudiation and permits trustees to recover contributions accruing prior to repudiation. Some of the decisions adopting this position are *Todd*, 667 F.2d 800; *Southern Stress*, 509 F.Supp. 1097. The third view, *Todd*, 667 F.2d at 803, is that until the union affirmatively demonstrates majority status, no contract has been formed and a repudiation voids the contract *ab initio*. See *Washington Area Carpenters' Welfare Fund v. Overhead Door Co.*, 488 F.Supp. 816 (D.D.C.1980). The Fifth Circuit's decision in *Baton Rouge Bldg. & Const. Trades Council v. E. C. Shafer Constr. Co.*, 657 F.2d 806 (5th Cir. 1981), also embraces this last view. Accordingly, this Court begins its analysis with an examination of the *Shafer* decision.

7. In *Shafer*, the unions filed suit against the employer for enforcement of prehire agreements by which the unions sought to recover back pay and fringe benefits payable to employees. Shafer, a non-union employer, had bid non-union construction jobs. The unions picketed the job sites, and as a result of this coercion, the employer executed a prehire agreement. The employer subsequently failed to fully comply with its agreement to pay union-scale wages and various contributions.

Two years later, the employer signed an agreement authorizing a multiemployer bargaining unit ("MEBU") to represent it in future negotiations with local unions. The Fifth Circuit reversed the district court's holding that the prehire agreements ripened into enforceable collective bargaining agreements by virtue of the employer's unsanctioned authorization of the MEBU. The court of appeals held that a prehire agreement attains the status of an enforceable contract only upon a showing that the union represents a majority of employees in the bargaining unit. 657 F.2d at 809. Moreover, an employer may not enroll in a MEBU in the absence of the employees' assent, since employee assent assures that the rights of employees to freely choose their bargaining representative are protected. *Id.* at 811. The *Shafer* court recognized that *Higdon* was distinguishable in that *Higdon* arose in the context of an unfair labor practice charge, instead of a § 301 breach of contract action. The Fifth Circuit nonetheless held that a prehire agreement is unenforceable in the absence of a demonstration of majority support, for "[t]he direction of the pressure is the same—toward treatment of a nonmajority union as the employee's agent for collective bargaining." *Id.* at 813.

8. The Trustees attempt to distinguish the *Shafer* decision on several grounds. First they correctly point out that the plaintiffs in *Shafer* were unions, rather than trustees of pension funds. This argument, however, is not persuasive. The *Shafer* court expressly considered the Eighth Circuit's decision in *Associated Wrecking*, 638 F.2d 1128. In *Associated Wrecking* trustees of a health and benefit plan together with the union sought to enforce a prehire agreement, despite the absence of majority status. The Eighth Circuit distinguished *Higdon*, in part on the ground that the interest at stake was that of the employees who benefitted through payments made on their behalf at the time of employment, rather than that of the union, which attempted to enforce the prehire agreement to obtain majority status. *Id.* at 1133–34.

The court in *Associated Wrecking* concluded that both the trustees and the union[2] could enforce the fringe benefit provisions of the prehire agreement. *Id.* at 1134. In rejecting the position taken in *Associated Wrecking*, the *Shafer* court made no attempt to distinguish the cases on the basis of *who* was seeking to enforce the prehire agreement. *See Shafer*, 657 F.2d at 812–13. Moreover, the fact that the *Shafer* court held that payment of the fringe benefit contributions pursuant to the prehire agreement were subject to the same requirements as the wage provisions, *id.* at 813, suggests that the *Shafer* court would have reached the same conclusion had trustees of pension funds, rather than the union, brought the enforcement action. The court stated:

> The trial judge correctly linked the obligation to contribute the fringe benefits to the enforceability of the underlying prehire agreements. This obligation was developed in the collective bargaining context like the wage provisions of the prehire agreements, it must await a showing of union majority before it is enforceable.

*Id.* Given the *Shafer* court's apparent recognition that "the goal is the maintenance and insurance of *employee* free choice," *id.*, together with its refusal to enforce the fringe benefit contributions, *id.*, the proposition that the Trustees' enforcement action does not implicate the issue of employee free choice must be rejected. *But see Carpenters Health and Welfare Trust Fund v. Ed Dos Reis*, No. 80–960–LKK (E.D.Cal. Nov. 10, 1981) (*withdrawn from publication*, 525 F.Supp. 1141).

The Trustees also attempt to distinguish *Shafer* on the ground that the Fifth Circuit did not address the applicability of § 515 of ERISA, 29 U.S.C. § 1145,[3] which was enacted on September 26, 1980.[4] Although *Shafer* was not based on § 515, it should be noted that the plaintiff in *Shafer* filed their suit under ERISA after the enactment of § 515, together with the LMRA. *Shafer*, 657 F.2d at 807 n.1. The Trustees urge this Court to follow the decision in *Ed Dos Reis*,[5] which expressly considered the applicability of § 515 to prehire agreements. The court in *Ed Dos Reis* not only held that *Higdon* may not be asserted as a defense in a collection action brought by employees' benefit trust funds pursuant to the LMRA, but it also held that § 515, according to its legislative history, was enacted to bar the employer's defense that the union had not represented a majority of the employees. 525 F.Supp. at 1146–47. The court concluded:

> Thus Congress—the final authority on matters of public policy—has indicated that public policy defenses like the one considered here may not be raised by employers defending against benefit plan trustees. Moreover, Congress specifically meant to preclude the federal courts from entertaining a *Higdon* defense in collection actions brought under ERISA.

*Id.* at 1147. The court did consider the argument that because § 515 encompasses the language "Every employer ... shall, to the extent not inconsistent with law," an enforcement action is necessarily subject to a defense that such prehire agreements violate the principles of law expressed in *Higdon*; the court in *Ed Dos Reis*, however,

---

**2.** In light of the distinctions drawn by the court in *Associated Wrecking*, 638 F.2d at 1133–39, as to *Higdon*, it appears that the Eighth Circuit concluded that an action brought by a union to enforce a prehire agreement is not a *per se* attempt to achieve majority status. Otherwise, the court would not have held that both the trustees and the union could seek enforcement.

**3.** Section 515 provides:
Delinquent Contribution.
Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

**4.** This Court held in its Order of March 5, 1982, that § 515 may be applied retroactively.

**5.** Although *Ed Dos Reis* was withdrawn from publication in the bound volume of the Federal Supplement, the case was printed in the paperback edition. The citations herein refer to the pagination in the paperback edition.

rejected this argument based on its interpretation of the legislative history underlying the enactment of § 515. *Id.* at 1147.

Not surprisingly, the *Ed Dos Reis* opinion was withdrawn after the Supreme Court rendered its decision in *Kaiser Steel Corp. v. Mullins,* — U.S. —, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982). In *Kaiser Steel,* trustees of health and retirement funds sought to enforce the reporting and contribution requirements which arose out of a collective bargaining agreement between the employer-coal producer and a mine workers' union. The section of the agreement concerning the contributions contained a clause requiring producers to report their purchases of coal from producers not under union contract. The employer failed to report the coal it acquired from other producers or to make contributions thereon, and it sought to defend the enforcement action on the ground that the contribution clause violated the antitrust laws under the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 8(e) of the LMRA, 29 U.S.C. § 158(e). The employer asserted that the contribution clause penalized it for shopping among (non-union) sellers for the lowest available price, which violated the prohibition against contracts which restrain trade. In addition, Kaiser Steel argued that the contribution provision was a "hot cargo clause" because its operation, by requiring contributions, penalized Kaiser Steel for doing business with other employers who do not have a union contract.[6] Without deciding whether the clause actually violated the antitrust and labor laws, the Court held that the employer could assert the defense of illegality on a collection action. Distinguishing earlier cases in which the illegality defense was not sanctioned, the Court stated:

> If the purchased coal agreement is illegal, it is precisely because the promised contributions are linked to purchased coal and are a penalty for dealing with producers not under contract with the [union] .... Here, employer contributions to union welfare funds may be quite legal

more often than not, but an agreement linking contributions to purchased coal, if illegal, is subject to the defense of illegality.

*Id.* at — —, 102 S.Ct. at 858–59, 70 L.Ed.2d at 842–43. The Court rejected further the contention that pension fund trustees, as innocent third parties, are exempt "from the general rule that courts do not enforce illegal contracts." *Id.* at — n.8, 102 S.Ct. at 859 n.8, 70 L.Ed.2d at 843 n.8.

In its consideration of § 515 of ERISA, the *Kaiser Steel* Court rejected the position advanced in Justice Brennan's dissent (and in *Ed Dos Reis*) that Congress intended to preclude employers from raising defenses against trustees in collection actions. *Kaiser Steel,* at — — —, 102 S.Ct. at 860–62, 70 L.Ed.2d at 845–47. Emphasizing § 515's "inconsistent with law" language, the Court stated that "[t]he Congressmen did not say that employers should be prevented from raising all defenses; rather, they spoke in terms of 'unrelated' and 'extraneous' defenses." *Id.* at —, 102 S.Ct. at 861, 70 L.Ed.2d at 846. Rejecting the argument that "Congress implicitly repealed the antitrust laws, the labor laws, and any other statute which might be raised as a defense to a provision in a collective bargaining agreement requiring an employer to contribute to a pension fund," *id.* at —, 102 S.Ct. at 862, 70 L.Ed.2d at 847, the Court concluded that § 515 may not be used as an escape hatch when enforcement of the contribution clause necessarily "command[s] unlawful conduct." *Id.* at —, 102 S.Ct. at 856, 70 L.Ed.2d at 840.

9. This Court is of the opinion that the issue in the case at bar turns on whether the contribution provision is inextricably tied to the prehire agreement—*Higdon* defense. The *Kaiser Court* summarily distinguished three cases, *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960); *Huge v. Long's Hauling Co.,*

---

**6.** Section 8(e) of the LMRA forbids contracts whereby the employer promises the union that it will cease doing business with another employer. *Kaiser Steel,* at —, 102 S.Ct. at 856, 70 L.Ed.2d at 840.

*Inc.*, 590 F.2d 457 (3d Cir. 1978); *Lewis v. Mill Ridge Coals, Inc.*, 298 F.2d 552 (6th Cir. 1962), which were cited with approval of § 515's principal sponsors on the basis that the decisions did not involve the " 'enforcement of a contribution clause that was itself alleged to violate the law.' " *Kaiser Steel*, —— U.S. at ——, 102 S.Ct. at 861, 70 L.Ed.2d at 846 (citation omitted). This Court thus must examine the relationship between the present cases and the three earlier decisions.

In *Benedict Coal*, trustees of a union welfare fund sought to recover amounts withheld by the employer. The Court held that the employer could not assert against the trustees the defense that the employer was excused from its performance of its duty to make contributions because the union violated the no-strike clause in the collective bargaining agreement by participating in strikes and work stoppages. The Court analyzed the issue in terms of general principles of contract law, and concluded first that the union's performance of its promises, in light of the express language of the agreement, was not a condition precedent to the employer's duty to contribute to the fund. 361 U.S. at 466, 80 S.Ct. at 493. The Court next held that the general rule that a third party beneficiary is subject to the promisor's defenses and counterclaims against the promisee is inapplicable in an industry-wide collective bargaining context, particularly where the agreement does not indicate that the parties intended to permit the employer to reduce its contributions by the amount of its damages caused by the striking unions. *Id.* at 466–70, 80 S.Ct. at 493–95.

*Long's Hauling*, like *Kaiser Steel*, raised the question of whether defenses based on an alleged violation of the Sherman Act and the use of a hot cargo clause could be asserted by the employer against the trustees of health and retirement funds. Unlike *Kaiser Steel*, however, the suspect clause was not contained within the contri-

bution provision itself. The employer had been coerced[7] into signing a national wage agreement which provided that the employer was obligated to make contributions to national rather than private funds as it previously had done. Apart from this provision was a clause prohibiting signatories from contracting the handling of coal to a trucker who was not a party to the national agreement. Noting that the employer's counterclaims for damages against the trustees for alleged violations of the labor and anti-trust laws were still pending, the court held that the employer could not raise by way of defense the alleged antitrust and labor law violations against the trustees in a collection action. *Long's Hauling*, 590 F.2d at 460–61.

In *Mill Ridge*, coal mine operators were obligated to pay royalties to welfare funds based on the amount of coal produced. The court held that the operators could not assert the defense of failure of consideration against the trustees. This holding was based on the court's broad interpretation that *Benedict Coal* precluded the application of the law of contracts to collective bargaining agreements. *Mill Ridge*, 298 F.2d at 556–57. The fact that the alleged misconduct arising out of a breach of fiduciary responsibilities was attributed to the trustees rather than the union was irrelevant to the *Mill Ridge* court. *Id.* at 557. The court noted, however, that the operators could seek equitable remedies for the alleged failure of expected consideration of better employer-employee relations resulting from a failure to create a trust fund with vested, legally enforceable rights in union members. *Id.* at 588.

10. While the Court questions whether the same results would have been reached in *Long's Hauling* and *Mill Ridge* if they had arisen after *Kaiser Steel*, the Court nonetheless concludes that the instant case is more analogous to the situation in *Kaiser Steel*. In contrast to the trio which the *Kaiser Steel* Court distinguished as not in-

---

**7.** Union organizers prevented the employer's drivers from transporting coal until the em-

ployer signed the national agreement.

volving "defense[s] based on the illegality of the very promise[s] sought to be enforced," *Kaiser Steel*, —— U.S. at ——, 102 S.Ct. at 862, 70 L.Ed.2d at 847, the validity of the Employer's promise to make contributions is dependent on whether the prehire agreement as a whole is enforceable in light of the particular circumstances presented herein. *See Overhead Door*, 488 F.Supp. 816, 819. The *Kaiser Steel* Court has indicated that the key question is *not* whether promises to make contributions, because not illegal in and of themselves, may be enforced. *Id.* at ——–——, 102 S.Ct. at 856–57, 70 L.Ed.2d at 840–41. Like the employer in *Kaiser Steel*, the Employer herein "did not make a naked promise to pay money to the union funds." *Id.* at ——, 102 S.Ct. at 856, 70 L.Ed.2d at 841. Rather, the promise to make contributions arose by virtue of the prehire agreement, the validity of which is now in dispute. In a sense, the issue in this case comes full circle: because the contribution provision is inherently linked to the prehire agreement and may not be considered as an extraneous, severable clause, the former may be enforced only if the prehire agreement is itself enforceable.[8]

■ 11. This Court concludes that the failure to attain majority status precludes the enforceability of the prehire agreement. *Shafer*, 657 F.2d 806. This conclusion is buttressed by the Fifth Circuit's recent opinion in *N. L. R. B. v. Haberman Construction Co.*, 641 F.2d 351 (5th Cir. 1981) (en banc). Although the issue in *Haberman* focused on whether a union must reestablish its majority at each successive job site to enforce a prehire agreement with a project-by-project employer, *id.* at 368, the Court reaffirmed the voidable quality of the prehire agreement as well as the "limited scope" of the § 8(f) exception. *Id.* at 365. That the Fifth Circuit sitting en banc required the reestablishment of a majority status at each jobsite is consistent with the very limited use with which the prehire agreement is intended to serve. *See id.* at 365. Moreover, this Court finds nothing in *Shafer* or *Haberman* to suggest that a prehire agreement is enforceable until repudiated by the employer. On the contrary, the *Haberman* court's reference to a prehire agreement as a "preliminary step" which facilitates negotiation, 641 F.2d at 365, suggests that there is no need for repudiation because the agreement does not become enforceable unless and until the union demonstrates majority support. *Id.*

The Court thus holds that the Employer executed a prehire agreement which, on account of the union's failure to attain majority support, never matured into a binding agreement. The Court notes that its refusal to enforce the agreement executed by the Employer is not inequitable under the circumstances. The Employer demonstrated that it was coerced into signing the 1972 short form agreement by the threat of a shutdown of its jobsite. Nor is it unfair in the Court's opinion, to subject the nonunion employees to the long-standing policy of the Employer to differentiate between the union and non-union workers with respect to contributions: a bargaining representative election could have been called at any time, despite the prehire agreement, and a majority showing would have made the Employer subject to a binding collective bargaining agreement. *Haberman*, 641 F.2d at 365.

12. Accordingly, Judgment shall be entered in this action directing that the Trustees take nothing and that the Employer recover its costs of action.

---

8. The Court notes that the discussion in *Benedict Coal*, 361 U.S. at 465–66, 80 S.Ct. at 493–94, may be relevant to this analysis. The Court held that the union's adherence to the no strike clause was not a condition precedent to the employer's promise to pay royalties. This conclusion was based on the express language of the agreement. *Id.* The Court thus implied that had the union and employer intended to create a condition precedent, the trustees may have been bound thereby. Such an inference could arguably support this Court's holding that the enforceability of the Employers promise to make contributions is dependent on the enforceability of the prehire agreement.