**BATON ROUGE BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL–CIO, et al., Plaintiffs-Appellees Cross-Appellants,**

v.

**E. C. SCHAFER CONSTRUCTION COMPANY, INC., Defendant-Appellant Cross-Appellee.**

**No. 80–3613.**

United States Court of Appeals, Fifth Circuit.*

Unit A

Oct. 2, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

G. Michael Pharis, Baton Rouge, for defendant-appellant cross-appellee.

Dodd, Barker, Boudreaux, Lamy & Gardner, Louis L. Robein, Jr., New Orleans, La., for plaintiffs-appellees cross-appellants.

Before CHARLES CLARK and GEE, Circuit Judges, and SPEARS,** District Judge.

GEE, Circuit Judge:

The Baton Rouge Building and Construction Trades Council, AFL–CIO, and several associated unions (International Union of Operating Engineers, Local 406; Construction and General Laborers Local 1177; United Brotherhood of Carpenters and Joiners, Local 1098) filed suit against E. C. Schafer Construction Company for enforcement of the provisions of various "prehire agreements" executed by Schafer and the unions.[1] The unions sought recovery of back pay and fringe benefits[2] payable to the employees under the terms of the agreements, as well as attorneys' fees.

Prior to the fall of 1974, Schafer had been a nonunion employer engaged primarily in the residential construction business. In the fall of 1974 the company began bidding on and receiving commercial construction contracts. Union members picketed the first of these jobs, which had been bid non-

---

** District Judge of the Western District of Texas, sitting by designation.

1. Plaintiffs filed suit under 29 U.S.C. § 185(a), section 301(a) of the Labor Management Relations Act, and 29 U.S.C. § 1001, *et seq.*, the Employee Retirement Income Security Act (ERISA).

2. The fringe benefits related to employer contributions to various of the unions' funds: the

union.[3] Meetings between the employer and union representatives resulted in the execution of these prehire agreements between Schafer and the operating engineers', carpenters', and laborers' locals. On some subsequent projects the company complied with the terms of the agreements and paid union-scale wages and contributed to the various union funds; its record of compliance was spotty, at best.

On February 6, 1976, Schafer signed a form authorizing the Associated General Contractors of Louisiana ("AGC"), a multiemployer bargaining unit ("MEBU"), to represent it in future negotiations with two of the locals, those for carpenters and operating engineers. Schafer's adherence to the terms of the prehire agreements after this authorization to the AGC did not advance. The parties stipulated that all agreements between them terminated on April 30, 1978. On March 14, 1979, the union plaintiffs filed suit against Schafer for alleged breaches of these agreements.

The central question at trial was the enforceability of these prehire agreements. The district court concluded that prior to the February 6, 1976, agreement between Schafer and the AGC the prehire agreements with the various unions did not mature into enforceable collective bargaining agreements. The court found that the execution of that February 6 authorization form, however, "effectively merged" Schafer into the MEBU; at that point the prehire agreements with the carpenters and operating engineers became enforceable contracts.[4] In refusing to abide by all their

terms, the company was in breach of those prehire, now-turned collective bargaining, agreements. The court ordered the company to pay union-scale back wages and make the required payments into the various carpenters' funds. The district court, 492 F.Supp. at 540, also awarded plaintiffs their attorneys' fees.

Schafer appeals from the court's finding that the prehire agreements with the carpenters ripened into a collective bargaining agreement with the execution of the form authorizing the AGC to bargain on its behalf with the union. The unions cross-appeal from the court's determinations that prior to the February 6, 1976, authorization the carpenters' prehire was not an enforceable contract and that the laborers' prehire agreement never matured into a collective bargaining agreement. We affirm the court's finding that none of the prehire agreements were enforceable contracts prior to February 6, 1976, and thus that the laborers' never became so. We reverse the court's conclusion that the February 6 authorization letter transformed the carpenters' prehire into a full-fledged contract and remand for consideration of evidence of union support among carpenters employed by Schafer after February 6, 1976.[5] We also reverse the award of attorneys' fees granted plaintiff as at least premature and perhaps unwarranted; defendant's refusal to abide by the agreements both before and after its February 6 authorization letter was an act within its legal rights, and not any manner of bad-faith refusal to abide by an enforceable contract.

---

pension funds; health and welfare funds; and apprenticeship funds.

**3.** The construction of an administrative building and gatehouse at the Port Hudson, Louisiana, plant of Georgia Pacific.

**4.** The prehire agreement with the laborers' union was unaffected by "merger" of Schafer into the MEBU, since the company failed to check the laborers' local on the authorization form of February 6 as one with whom the AGC was to negotiate on its behalf. The finding that the prehire agreement with the operating engineers' local became an enforceable contract

from February 6, 1976, to April 30, 1978, is unimportant under these circumstances; Schafer employed no operating engineers during that relevant term. The only prehire agreement affected, then, by this merger argument is that with the carpenters' local.

**5.** Since the district court concluded that the February 6 "merger" of Schafer into the AGC obviated any need for inquiry into the strength of union support among Schafer's carpenters after that date, it did not weigh and evaluate the "voluminous evidence," 492 F.Supp. at p. 537, submitted on that point.

*I.   Finding of No Union Majority before February 6, 1976.*

■ Section 8(f) of the National Labor Relations Act[6] authorizes prehire agreements between employers and unions in the construction industry; absent that statutory recognition of conditions peculiar to that industry, such agreements would be barred as violative of employee free choice. In *NLRB v. Local Union No. 103, International Association of Bridge, Structural & Ornamental Iron Workers, AFL–CIO (Higdon Construction Co.)*, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978), the Supreme Court addressed the nature and effect of construction industry prehire agreements.

> The Court has held that both union and employer commit unfair practices when they sign a collective bargaining agreement recognizing a union as the exclusive bargaining representative when in fact only a minority of employees have authorized the union to represent their interests. ... Section 8(f) is an exception to this rule.

*Id.* at 344–45, 98 S.Ct. at 657. The exception is limited, however, by a concern for protecting the employees' section 7 rights: the prehire agreement attains the status of a collective bargaining agreement, that is, an enforceable contract, only upon a showing that the union enjoys majority support in the relevant bargaining units. "The employer's duty to bargain and honor the contract is contingent on the union's attaining majority support at the various construction sites." *Id.* at 345, 98 S.Ct. at 658. Applying that legal principle, the district judge found that the unions had failed to prove majority support at the particular job sites where enforcement of these agreements was sought at any time subsequent to their execution and prior to the agreement between Schafer and the AGC. Without this showing of union majority support, the prehire agreements did not flower into enforceable contracts before February 6, 1976.

The court's finding of fact here is not clearly erroneous and must be affirmed. Indeed, the unions in their cross-appeal do not challenge the factfinding as itself erroneous but rather attack its legal underpinnings. The unions argue that the district court erred in its determination of insufficient union support by requiring proof of union majority at each successive job site; the unions assert, in reliance on an opinion of a panel of this court, *NLRB v. Haberman Construction Co.*, 618 F.2d 288 (5th Cir. 1980), that the unions enjoyed majority status in the relevant bargaining units following the execution of the prehire agreements and that a presumption of continuing union support follows that bargaining unit from job site to job site.

The unions correctly take solace in that opinion, which squarely supports their position. Subsequent consideration by this court *en banc* renders that comfort exceedingly short lived. *See* 641 F.2d 351 (5th Cir.

**6.**  29 U.S.C. § 158(f) reads:

> It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or give such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: provided, That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

1981) (en banc). Adopting and reaffirming the NLRB's position in *Dee Cee Floor Covering, Inc.*, 232 NLRB 421 (1977), the *en banc* court stated: "in order to enforce a section 8(f) contract with a project-by-project employer, the union must reestablish its majority at each successive job site." 641 F.2d at 368. No assertion is made that Schafer employed a stable work force; the record demonstrates that its hiring was on a project-by-project basis. The district court applied a correct legal principle in its analysis of union support in Schafer's work force; its decision that, prior to February 6, 1976, the prehire agreements were not enforceable contracts is affirmed.[7]

## II. *Merger into the AGC on February 6, 1976.*

The heart of Schafer's appeal is the district court's decision that the prehire agreements with the carpenters and operating engineers matured into enforceable contracts with the execution by Schafer of the authorization agreement with the AGC. The trial court concluded that the February 6 letter "effectively merged the company with the other member companies of the Associated General Contractors as one large bargaining unit. Thenceforth, it became irrelevant whether a majority of Schafer's employees favored the union so long as a majority of those employed by the Associated General Contractors were union people." Upon that "merger" into the multiemployer bargaining unit, the relevant unit for determination of union majority became that multi-employer work force. Since there was no substantial doubt about the union sympathies of that larger body of workers,[8] the prehire agreements thereby matured into collective bargaining agreements.

■ The district court's analysis assumes what is not the case; that an employer, by its action alone and without the acquiescence of its employees, can commit itself to membership in an MEBU.[9] Enrollment of

---

7. Even had the *Haberman* panel analysis that the presumption of union majority support is applicable to a project-by-project construction work force withstood *en banc* consideration, the result in this case would have been no different. From what appears in their brief, the unions base their *Haberman* panel argument on an alleged demonstration of a union majority work force at the Georgia Pacific project, ongoing at the time these prehire agreements were executed. They assert that union support at that project turned the prehire agreements into enforceable collective bargaining agreements. That argument overlooks a provision in the prehire agreement that excluded from its terms the then-ongoing Georgia Pacific project: "This agreement will exclude the administration building and guardhouse at Georgia Pacific, Port Hudson . . . ." The district court found no evidence of construction activity by Schafer at the Georgia Pacific project other than that project excluded from the agreement's coverage.

8. In oral argument, Schafer's counsel asserted that no record evidence supported the court's conclusion that a majority of AGC's work force supported the unions as its bargaining agents. The record need not be examined for "clear error"; because of our conclusion that the court erred in accepting the "merger" theory, union support among the employees of the MEBU is irrelevant to our inquiry.

9. Schafer also argues that the agreement with the AGC was solely an authorization of bargaining on its behalf and not an expression of interest in membership in that MEBU. The unions reject the significance of this characterization: "A question of membership in a multi-employer bargaining group, as opposed to express delegation of authority to a multi-employer group, as the appellant did, is an irrelevant issue." Actual membership in an MEBU, however, entails a substantial commitment on the part of the employer. An employer can get "locked in" to an MEBU, thus losing its right to bargain separately at the risk of committing an unfair labor practice. *See, e. g., NLRB v. Marine Machine Works, Inc.*, 635 F.2d 522 (5th Cir. 1981). On the other hand, an employer that had authorized MEBU negotiation on his behalf could revoke that authorization and resume separate negotiations. The Board's opinion in *Amado Electric, Inc.*, 238 NLRB 37 (1937), recognizes the existence of such an "authorization to negotiate without membership." In *Amado Electric* the employer had signed two letters authorizing a local chapter of the National Electrical Contractors Association, an MEBU, to represent it in collective bargaining and had even paid yearly dues to that association. Despite those actions, the administrative law judge (in an opinion adopted by the Board) stated that it was undisputed that the employer "was not a member of the association." *Id.* at 38 n.6.

an employer into an MEBU necessarily restricts the representational choices of its employees; the individual work force is subsumed into that of the MEBU. Before an employer can properly join such an association of employers, there has to be some indication, explicit or implicit, of its employees' assent to that joining. Typically, the showing of assent will be satisfied by a demonstration that the employees of that entering employer are represented by, or are sympathetic to, the unions that act as bargaining representatives for those employees already covered by the MEBU. The mechanism of an MEBU can serve an important function in promoting efficient and consistent bargaining in an industry, as well as promoting the bedrock goal of industrial peace. The requirement of employee assent to employer membership insures that, along with the promotion of such goals, there goes a protection of the section 7 rights of the individual employees freely to choose their desired bargaining representative. *See John Ascuaga's Nugget*, 230 NLRB 275 (1977).

As authority for its conclusion about Schafer's merger into the AGC and the consequent transformation of the prehire agreements, the district court cited the Board's opinion in *Authorized Air Conditioning Co.*, 236 NLRB 131 (1978). The Ninth Circuit's subsequent affirmance of that Board order clarifies what was at issue in that case and offers no support to the district court's conclusion here. *Authorized Air Conditioning Co. v. NLRB*, 606 F.2d 899 (9th Cir. 1979). At the time the employer and the union executed the prehire agreement in *Authorized Air*, the union did not enjoy majority support in the covered work force; indeed, none of the employees were union members. Subsequent to the execution of the agreement, the employees joined the union. Later the company applied for membership in an employer's association (one that dealt with the signatory union) and was accepted. At that time a majority of the company's work force was nonunion. The company refused to abide by a collective bargaining agreement negotiated by the MEBU with the union. The Ninth Circuit affirmed the Board's conclusion that the employer was nevertheless bound by the agreements.

The factual distinctions between that case and this are significant. Subsequent to the execution of the prehire agreements and prior to application for membership in the MEBU, the union in *Authorized Air* attained majority support among the employees of the company. With such union support, the prehires became enforceable collective bargaining agreements prior to the company's application for MEBU membership. It is an established principle that the existence of an effective collective bargaining agreement raises a presumption of continuing union support in the covered work force. The court concluded that these prehire agreements, rendered enforceable by the manifestation of union support, raised the same, continuing presumption,[10] which was not rebutted by evidence that the majority of employees at the time of the employer's application and acceptance into the MEBU were not union members. "It is well established that union membership is not always an accurate barometer of union support." 606 F.2d at 905. This presumption of continuing union support provided the requisite demonstration of em-

Because of our finding that employer assent to Schafer's membership was necessary and here lacking, the proper characterization of Schafer's February 6 action is, as the union urges for a different reason, "irrelevant." Regardless of what it thought it was doing, Schafer could not unilaterally join that MEBU.

**10.** It may be noted that a fundamental element of the Ninth Circuit's analysis—that a presumption of continuing union support follows from the maturation of a prehire into a collective bargaining agreement—may be questiona-

ble in light of language in *Higdon Construction Co.*, 434 U.S. at 345, 98 S.Ct. at 657: "the usual rule protecting the union from inquiry into its majority status during the terms of a collective bargaining contract does not apply to prehire agreements." Perhaps, though, the presumption stands absent petition by the employer or nonconsenting employees under § 9 of the Act for a representation election (a petition process specifically contemplated by the terms of § 8(f) itself).

ployee assent to membership in the MEBU. As a member of that employer group, the company was bound by its agreements with the union.

■ This case would offer something of a reverse twist on that analysis: that an authorization to negotiate granted an MEBU by an employer (or even an application for membership in that employer group) in focusing attention on the strength of union support in that employer association rather than in the individual work force becomes a key element in the transformation of a prehire into a collective bargaining agreement. This approach, while artful, is unconvincing. Two elements, the maturation of a prehire into a collective bargaining agreement and employer membership in an MEBU, each separately requiring a manifestation of majority union support among the affected employees, were joined together by the court without that showing. We cannot accept the simultaneous and mutual bootstrapping of these two principles inherent in the court's conclusions: that the employer joined the MEBU and that the prehire agreements consequently became enforceable contracts without any finding that the Schafer employees assented to these developments. This portion of the judgment must be reversed. Because of his conclusions on the effect of that February 6 agreement between Schafer and the AGC, the district judge did not examine evidence of the company's hirings subsequent to February 6, 1976. Remand will allow the court an opportunity to evaluate evidence of possible union support among the carpenters employed by Schafer after that date.[11]

In reaching our decision that the trial court erred in finding the prehire agreements to have become enforceable contracts, we relied on language in *Higdon Construction Co.*[12] and *Haberman Construction Co. (en banc)*[13] that recognized the voidable nature of prehire agreements. The unions now urge a position recently adopted by the Eighth Circuit in *Health & Welfare Plan v. Associated Wrecking & Salvage Co.*, 106 L.R.R.M. 2257 (8th Cir. 1981). In *Associated Wrecking* the court concluded that the fringe benefit provisions (*i. e.*, employer contributions to various employee trust funds) of a prehire agreement could be enforced against the employer in a breach of contract action even though the union's majority status had never been demonstrated. It appears that only the fringe benefit contributions were at issue in *Associated Wrecking*, so the discussion in that case was limited to enforcement of their terms. Nothing in the opinion suggests that its analysis would not apply equally to the enforceability of the entire agreement between a union and an employer. In reaching its decision, the Eighth Circuit distinguished *Higdon Construction Co.* on the basis that the Supreme Court had discussed the nature of prehire agreements in the context of unfair labor practice charges only and not, as in *Associated Wrecking* (and here), in the context of a section 301 breach of contract suit. 106 L.R.R.M. at 2259–60.

We acknowledge that neither *Higdon* nor *Haberman* directly dealt with the question of the nonenforceability of a prehire agreement as a defense to a breach of contract suit; these cases are not, therefore, square-

---

11. Schafer argues that, in deciding to look to the union sentiments of the multi-employer work force in order to determine the enforceability of the prehire agreements, the district court trespassed on the exclusive jurisdiction of the Board, under 29 U.S.C. § 159(b), to determine appropriate units for collective bargaining. Because of our conclusion that the court's "merger" theory is incorrect and must be reversed, we need not and do not consider Schafer's abstruse jurisdictional objection.

12. "The employer's duty to bargain and honor the contract is contingent on the union's attain-

ing majority support at the various construction sites." 434 U.S. at 345, 98 S.Ct. at 658.

13. Prior to that time [when a demonstration that the union represents a majority of the covered employees is made], however, section 8(f) agreements are entirely voidable; since the union does not represent a majority of the employees, it is not entitled to enter into a binding collective bargaining agreement with the employer.
641 F.2d at 365.

ly in point. But this distinction makes no difference. If the goal is the maintenance and insurance of *employee* free choice, it matters not whether the sword dangling above the employer's head is an unfair labor practice charge or a breach of contract suit. The direction of the pressure is the same— toward treatment of a nonmajority union as the employee's agent for collective bargaining.

### III. *Fringe Benefit Contributions.*

Under the terms of the various prehire agreements, the employer promised certain contributions on behalf of its employees to the union's benefits funds. As was true of its compliance with the wage portions of these agreements, Schafer's record of contributions to the funds was spotty. The district court concluded that Schafer was obligated to pay into the funds the amount owed under the carpenters' prehire from February 6, 1976, to the termination date of these agreements. When the prehire agreement became an enforceable contract, the employer became liable for payment under all its provisions.

The unions assert that "[t]he district court did not decide the separate issue of the enforceability of the participation agreements relating to defendant employer contributions to various trust funds administering the various employee benefit plans identified in the various agreements." We find no basis for consideration of such a "separate issue." The trial judge correctly linked the obligation to contribute the fringe benefits to the enforceability of the underlying prehire agreements. This obligation was developed in the collective bargaining context; like the wage provisions of the prehire agreements, it must await a showing of union majority before it is enforceable.

Since we find that the district court erred in its underlying decision on the enforceability of the carpenters' prehire agreement, we likewise reverse its judgment on Schafer's obligation to contribute to that union's benefits funds. Should the district court on remand find, *see* Part II, *supra*, that the carpenters' prehire became a collective bargaining agreement subsequent to February 6, 1976, then a judgment holding Schafer liable for appropriate contributions to those funds would be proper.

### IV. *Attorneys' Fees.*

In light of our conclusion on the current record that Schafer did not breach an enforceable contract by its failure fully to abide by the terms of the prehire agreements, an award to the unions of their attorneys' fees is insupportable. We reverse that portion of the judgment.

### V. *Conclusion.*

In summary, we affirm the district court's conclusions that before February 6, 1976, none of the prehire agreements had matured into collective bargaining agreements and that the laborers' prehire never became enforceable. We reverse the court's decision that the February 6 letter authorizing the AGC to negotiate on Schafer's behalf effected a "merger" of Schafer into the MEBU, thereby transforming the carpenters' and operating engineers' prehires into enforceable contracts on the basis of union strength in that multi-employer work force. With that decision, we likewise reverse the finding on Schafer's obligation to contribute to the carpenters' benefits funds and the award to plaintiff unions of their attorneys' fees. We remand for consideration of the degree of union support among Schafer's carpenters employed between February 6, 1976, and April 30, 1978.

AFFIRMED in part, REVERSED in part, and REMANDED.