812 F.2d 1518
 124 L.R.R.M. (BNA) 2878, 55 USLW 2502,
106 Lab.Cas. P 12,259,
8 Employee Benefits Ca 1434
 TRUSTEES OF the COLORADO STATEWIDE IRON WORKERS (ERECTOR)
JOINT APPRENTICESHIP AND TRAINING TRUST FUND; Trustees of
the Colorado Iron Workers Pension Fund; Trustees of the
Iron Workers Welfare Plan of Colorado, Plaintiffs-Appellees,
v.
A & P STEEL, INC., a Colorado corporation, and the Western
Casualty and Surety Company, a Kansas corporation,
Defendants-Appellants.
 No. 84-1489.
 United States Court of Appeals,
Tenth Circuit.
 March 2, 1987.
 
 Timothy J. Parsons, Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, Colo., for plaintiffs-appellees.
 M. Edward Taylor (James E. Hautzinger with him on brief), Sherman & Howard, Denver, Colo., for defendants-appellants.
 Before McKAY, ANDERSON, and BALDOCK, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 A & P Steel, Inc. ("A & P") appeals from a judgment entered against it by the district court with respect to unpaid contributions to three Union trust funds under two successive collective bargaining agreements. The agreements in question are between (1) Locals 24 and 750 of the International Association of Bridge, Structural, and Ornamental Ironworkers, AFL-CIO ("Union"), and (2) employers who are members of or who have assigned their bargaining rights to the Associated General Contractors of Colorado ("AGC"). The agreements cover two successive three-year periods, from May 1975 through April 1978 and from May 1978 through April 1981. A & P conceded that it became a party to these agreements by virtue of its assignment of its bargaining rights to the AGC in January of 1975 and January of 1978.
 
 
 2
 The agreements required A & P to make specified contributions, based on the number of hours of "covered work" performed by its employees, to three Union Trust funds: the Colorado Ironworkers Pension Funds, the Ironworkers Welfare Plan of Colorado, and the Colorado Statewide Ironworkers (Erector) Joint Apprenticeship and Training Trust Fund (collectively "Trusts" and "Trustees"). A & P was also required to file monthly reports with the Trustees, which were to include, among other things, an accounting of the hours of covered work performed by employees of A & P. The agreements with the Union expansively defined covered work as "[a]ll work in connection with field fabrication and/or erection of structural, ornamental and reinforcing steel ... on or in all private and public building construction, whether or not classified as utility, heavy engineering, highway, industrial, institutional, commercial or other construction performed in the State of Colorado and portions of the States of Kansas and Nebraska...." Plaintiff's Ex. 2 at 2, 8; Plaintiff's Ex. 4 at 3, 9.
 
 
 3
 A & P filed the required monthly reports with the Trustees through January 1980, reporting in each instance that no covered work was performed by its employees, although such work was in fact performed. On November 4, 1980, the Trustees filed suit against A & P to collect the unpaid contributions relating to work covered under the agreements but not reported by A & P. On November 14, 1980, ten days after the suit was filed, the President of A & P, Mr. T.G. Pearce, sent letters to the Union informing them that:
 
 
 4
 A & P Steel, Inc. deems contract void and no effect because the Ironworker Union does not have a majority status with A & P Steel, Inc. who disavows and disaffirms any contract with Ironworkers at the below jobsite: [seven sites specified, one in each of seven letters].
 
 
 5
 Defendant's Exs. C, D, E, F, G.
 
 
 6
 These letters point to a central legal consideration in this case, i.e., whether the agreements were prehire agreements with respect to A & P under section 8(f) of the National Labor Relations Act ("NLRA"), 29 U.S.C. Sec. 158(f) (1982). As the letters reflect, either all or a substantial majority of A & P's employees were not members of the Ironworkers' Union. Section 8(f) of the NLRA "allows construction industry employers and unions to enter into agreements setting the terms and conditions of employment for the workers hired by the signatory employer without the union's majority status first having been established in the manner provided for under Sec. 9 of the Act." Jim McNeff, Inc. v. Todd, 461 U.S. 260, 266, 103 S.Ct. 1753, 1756, 75 L.Ed.2d 830 (1983). As McNeff noted, (1) "[a] Sec. 8(f) prehire agreement is subject to repudiation until the union establishes majority status," (2) "when such an agreement is voluntarily executed, both parties must abide by its terms until it is repudiated," and (3) "monetary obligations assumed by an employer under a prehire contract may be recovered in a Sec. 301 [of the National Labor Management Act] action brought by a union prior to the repudiation of the contract." Id. at 271-72, 103 S.Ct. at 1759. When monetary recovery was sought by the Union, A & P contended, among other things, that it had repudiated what it considered to be prehire agreements. The Union, in turn, maintained that A & P's assignment of its bargaining rights to the AGC shifted the determination of majority status under the agreements to a determination of majority union representation with respect to all employees in the AGC, a multi-employer bargaining unit ("MEBU"), and not just with reference to an individual employer, i.e., A & P.
 
 
 7
 The district court referred the case to a special master for determination of the hours of "covered" work plus computation of contributions and damages. The special master found that during the period from May 1975 through December 1980 employees of A & P performed 27,929.5 hours of covered work. The district court subsequently adopted the report of the special master and entered judgment against A & P as follows: $62,580.07 in delinquent contributions; $52,513.02 in interest on the delinquent contributions to the day of trial; $52,513.02 in liquidated damages; $68,462.70 in attorneys' fees; and $5,144.12 in costs. The court also ordered A & P to pay interest on the $62,580.07 at 18% per annum from the day of trial to the date of payment, and interest on the remainder of the judgment at the statutory rate of 9.93% from the date of judgment.[1] R.Vol. I at 118-19.
 
 
 8
 On appeal A & P makes four arguments: (1) that under the doctrine of frustration of purpose it was not obligated under the agreements because the Union delivered no benefits to A & P, (2) that in any event these collective bargaining agreements were only prehire agreements with respect to A & P, which A & P legally repudiated under the authority of McNeff, (3) that the defense of laches applied, and (4) that there were errors in the special master's determination of the scope of work covered by the agreements and therefore in the size of the award to the Trustees.
 
 
 9
 The district court found that jurisdiction and venue had been admitted by the parties and were proper "under section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 and section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1132, as amended." Id. at 112. Although neither party raises any jurisdictional issue on appeal, we take note sua sponte of the major jurisdictional issue of whether the federal courts, rather than the National Labor Relations Board ("NLRB"), have authority to determine what the relevant bargaining unit is. If they do, we can then decide whether the collective bargaining agreements in this case constituted voidable prehire agreements with respect to A & P. In Section II of this opinion, we hold that we have such jurisdiction. We also affirm the district court's rulings on A & P's arguments (1), (3), and (4). We further decide that A & P, not the AGC, was the relevant bargaining unit for assessing union majority status and that, therefore, these agreements were prehire agreements with respect to A & P. Therefore, A & P successfully repudiated the agreements on November 14, 1980, and we remand under issue (2) for a recalculation of damages.
 
 I.
 FRUSTRATION OF PURPOSE
 
 10
 (Breach of Contract; Failure of Consideration)
 
 
 11
 From the outset of this case A & P has argued strenuously that it is not obligated to pay contributions to the Trusts because it received no benefit from the Union under either of the agreements in question. In particular, it argues that the Union did not respond to its requests for qualified ironworkers pursuant to the "Union Referral System" provided for by the agreements. It points out that "[a]lthough the record contains no express statement that the anticipated receipt of Union referrals was A & P's sole purpose in executing the agreements, the facts compel this conclusion." Reply Brief for Appellant at 3. Pursuing the point, A & P argues that its "employees were not unionized and had never displayed any desire to become so; A & P did not enter the agreements in order to remain on any union job sites; A & P did not experience labor unrest, from either internal or external sources, before or after the agreements were expressly repudiated. Thus, the only logical inference is that A & P executed the agreements to obtain Union referrals, which it never received." Id. at 3. The record, however, is not developed with respect to these assertions.
 
 
 12
 As an underpinning to its "no benefit" argument, A & P directs our attention to the following language from the Supreme Court's 1983 decision in Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983):
 
 
 13
 Nothing in the legislative history of Sec. 8(f) indicates Congress intended employers to obtain free the benefits of stable labor costs, labor peace, and the use of the union hiring hall. Having had the music, he must pay the piper.
 
 
 14
 By the same token, the union cannot simply accept the employer's performance under a prehire contract without upholding its end of the bargain. Neither party is compelled to enter into a Sec. 8(f) agreement. But when such an agreement is voluntarily executed, both parties must abide by its terms until it is repudiated.
 
 
 15
 Id. at 271, 103 S.Ct. at 1759 (footnotes omitted) (emphasis added).
 
 
 16
 During this litigation the "no benefit" argument has been advanced by A & P under virtually every available contract doctrine, including breach of contract, material breach, failure of consideration, and now frustration of purpose. On appeal, A & P concentrates solely on the doctrine of frustration of purpose, although the issue was not advanced as such in the proceedings below.[2]
 
 
 17
 The shift by A & P to a frustration of purpose argument on appeal is, we presume, an attempt to avoid the settled law that breach of contract by a union does not excuse an employer from its contract obligation to make pension and health trust fund contributions. Lewis v. Benedict Coal Corp., 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960). See also Huge v. Long's Hauling Co., 590 F.2d 457, 461-66 (3d Cir.1978) (concurring opinion), cert. denied, 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979); Sheriff v. Medel Elec. Co., 412 A.2d 38 (D.C.1980). See generally Southern Cal. Retail Clerks Union & Food Employers Joint Pension Trust Fund v. Bjorklund, 728 F.2d 1262, 1265-66 (9th Cir.1984); Mo-Kan Teamsters Pension Fund v. Creason, 716 F.2d 772, 775 (10th Cir.1983), cert. denied, 464 U.S. 1045, 104 S.Ct. 716, 79 L.Ed.2d 178 (1984); Washington Area Carpenters' Welfare Fund v. Overhead Door Co., 681 F.2d 1, 4-5 (D.C.Cir.1982), cert. denied, 461 U.S. 926, 103 S.Ct. 2085, 77 L.Ed.2d 296 (1983); Martin v. Benesh & Bruns, Inc., 532 F.Supp. 408, 415-16 (N.D.Ill.1982); Trustees of the Atlanta Iron Workers Local 387 Pension Fund v. Southern Stress Wire Corp., 509 F.Supp. 1097, 1104-05 (N.D.Ga.1981).[3]
 
 
 18
 We do not find it necessary to apply the rules embodied in the authorities just cited in order to dispose of A & P's contention. Frustration of purpose is wholly inapplicable to this case, as well as having been untimely raised as an issue. The doctrine deals with situations where supervening events destroy or alter the foundation of the contract. See Restatement (Second) of Contracts Sec. 265 (1981). It does not apply to simple failure by one party either wholly or partially to perform its obligations under a contract, and such nonperformance is the essence of A & P's charge against the Union in this case. The only case cited by A & P in direct support of its argument, Nash v. Board of Educ., 38 N.Y.2d 686, 382 N.Y.S.2d 31, 345 N.E.2d 575 (1976), is distinguishable on the very grounds just stated, i.e., supervening event. In that case a contract obligation to notify a teacher of denial of tenure by May 1 of the third year of employment was rendered inapplicable by legislative enactment extending the probationary employment period from three to five years.
 
 
 19
 Finally, for purposes of appellate review, A & P's contract arguments, whether couched in terms of frustration of purpose, breach of contract, or failure of consideration, are all controlled by the clearly erroneous standard with respect to the district court's findings on the subject of the Union's performance of the contract obligations. The facts were highly disputed at trial and continue to be argued on appeal. The district court reviewed the pertinent disputed facts, observed and weighed the credibility of witnesses, and concluded that A & P had not met its burden of showing that the Union had breached the agreements. The court referred to the testimony of all the key witnesses and found that there was insufficient direct evidence that the Union refused A & P's requests for union workers in any degree amounting to a contract breach.[4] The court also evaluated facts which suggested that A & P did not regard the agreements as being breached but rather considered them to be in force throughout their entire term. For instance, A & P sent monthly reports to the Trustees as required by the agreements; it assigned its bargaining rights in 1978 without mentioning any alleged breach of the preceding agreement; its letter of repudiation in November 1980 made no mention of any alleged breach or breaches; and prior to that time A & P issued no written complaint or formal demand for union workers.[5]
 
 
 20
 The real question before us, as indicated, is whether these controlling findings by the district court are clearly erroneous. On the basis of the record as a whole, illustrated by the preceding summary of the evidence, we conclude that they are not. While both parties may have demonstrated less than full cooperation under the agreements, A & P failed to meet its burden of proving nonperformance amounting to a violation of the contract by the Union. Accordingly, A & P's frustration, breach, and similar contract arguments must fail.
 
 II.
 REPUDIATION OF THE CONTRACTS
 
 21
 A & P argues that even if the Union were not in breach of the agreements, A & P was free to repudiate them because the Union had never acquired majority status among A & P's workforce. See Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983). Implicit in this argument is the contention that A & P, not the AGC, was the relevant bargaining unit for determining majority status and, therefore, the collective bargaining agreements were only prehire agreements with respect to A & P. A & P's repudiation argument is in two parts. A & P asserts that it repudiated the prehire agreements, both by conduct, at some unspecified time after the 1975 contract went into effect, and explicitly by its letters of November 14, 1980.
 
 
 22
 A & P's argument that its conduct prior to November 14, 1980 constituted repudiation is easily dismissed. The argument was never developed at trial and never addressed by the court. There are, consequently, no findings for us to review. Furthermore, we would not remand for findings on this point since the record clearly does not support a claim of repudiation by conduct prior to the November 14, 1980 letter, anymore than it supports A & P's breach of contract claim. On the contrary, A & P's conduct in filing its monthly reports, in entering the 1978 contract, and in failing to take any formal action questioning the performance of the Union constitutes evidence that no repudiation by conduct was effectuated, regardless of A & P's unilateral view of the agreements.
 
 
 23
 The letters of November 14, 1980 are another matter. Clearly, and on their face, the letters constitute a repudiation of the 1978-81 agreement--a repudiation which would be valid if the agreement was determined to be a prehire agreement rather than a full collective bargaining agreement. The district court decided that the 1975 and 1978 agreements could not be prehire agreements with respect to A & P on the grounds that the AGC was the relevant bargaining unit and that A & P had not shown that a majority of employees in the AGC were not members of the Union. According to the court, when A & P assigned its bargaining rights to the AGC its employees, in effect, merged with others in the AGC. Therefore, the judge held that A & P had entered into a full collective bargaining agreement which could not be repudiated.
 
 
 24
 Two questions arise from the district court's ruling that the 1975 and 1978 agreements were full collective bargaining agreements with respect to A & P: (1) whether the federal courts, rather than the NLRB, have jurisdiction to decide the relevant bargaining unit in the context of a contractual dispute in the construction industry, and if so, (2) whether the court correctly determined that the relevant bargaining unit was the AGC and not A & P. Although neither the district court nor the parties raised or examined the jurisdictional point, we raise it sua sponte, since the jurisdictional question must be settled prior to resolution of the repudiation issue.
 
 A. Jurisdiction
 
 25
 The district court's determination of the appropriate bargaining unit presents this court with a jurisdictional question that we have never before confronted. Initially, we note that section 301(a) of the Labor Management Relations Act (LMRA) vests federal courts with jurisdiction to examine alleged violations of contract agreements:
 
 
 26
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 
 
 27
 29 U.S.C. Sec. 185(a). But section 301 is more than jurisdictional; it forms the basis for the development of a federal common law interpreting and enforcing collective bargaining contracts. International Union of Operating Eng'rs v. Superior Rigging & Erecting Co., 602 F.Supp. 913, 916 (N.D.Ga.1984). Section 301 "expresses a federal policy that federal courts should enforce these agreements ... and that industrial peace can be best obtained only in that way." Textile Workers Union of Am. v. Lincoln Mills, 353 U.S. 448, 455, 77 L.Ed.2d 912, 917, 1 L.Ed.2d 972 (1957).
 
 
 28
 The Supreme Court has held that, under section 301(a) of the LMRA, federal courts have jurisdiction to enforce an arbitration clause even if the contract dispute involves a representational question and "even though an alternative remedy before the Board [i.e., a unit clarification petition] is available." Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 268, 84 S.Ct. 401, 407, 11 L.Ed.2d 320 (1964). Thus section 301 can provide parties to a labor contract with an independent forum for resolution of representational disputes in addition to NLRB disposition. The Court stated:
 
 
 29
 But the existence of a remedy before the Board for an unfair labor practice does not bar individual employees from seeking damages for breach of a collective bargaining agreement in a state court, as we held in Smith v. Evening News Assn., 371 U.S. 195 [83 S.Ct. 267, 9 L.Ed.2d 246]. We think the same policy considerations are applicable here; and that a suit either in the federal courts, as provided by Sec. 301(a) of the Labor Management Relations Act of 1947 ... or before such state tribunals as are authorized to act ... is proper, even though an alternative remedy before the Board is available, which, if invoked by the employer, will protect him.
 
 
 30
 375 U.S. at 268, 84 S.Ct. at 407 (citations omitted).
 
 
 31
 A later Supreme Court case appeared to narrow the scope of the Carey decision. In South Prairie Const. Co. v. Operating Eng'rs, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (per curiam), the Court held that a federal circuit court lacked jurisdiction, on appeal of an NLRB decision, to make an initial determination of which set of employees constituted the appropriate bargaining unit and must remand the case to the NLRB for an initial determination. Crucial to the outcome in South Prairie, in our view, was the fact that the NLRB had already assumed initial jurisdiction in the dispute, yet had not made a ruling on the relevant bargaining unit.
 
 
 32
 The arguably conflicting positions of the Court in Carey and South Prairie have produced a good deal of comment and analysis. Some courts have managed to avoid deciding representational issues raised as contractual disputes, while others have held that federal courts can resolve bargaining unit disputes that arise in the limited context of a genuine section 301 contract dispute, at least where a dispute containing a representational issue is not pending before the NLRB.[6]
 
 
 33
 We take the latter position and elect to follow the reasoning of the Fifth Circuit in Carpenters Local Union No. 1846 v. Pratt-Farnsworth, 690 F.2d 489 (5th Cir.1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). In Carpenters Local, a union brought a section 301 action to enforce a collective bargaining agreement against a non-signatory employer, arguing that the employer was either the "alter ego" of the signatory employer or that the two employers constituted only a "single employer" under the single employer doctrine. The district court held that the NLRB had exclusive jurisdiction to determine which employer was the appropriate bargaining unit under the single employer doctrine. The Fifth Circuit reversed, emphasizing that the bargaining unit issue must be understood in the context of a section 301 action:
 
 
 34
 We have seen that in deciding whether a collective bargaining agreement has been breached, the federal courts have been directed by Congress to create a federal common law of contract, fashioned from the policy of our national labor laws, applicable to collective bargaining agreements. Lincoln Mills, supra 353 U.S. at 456-57, 77 S.Ct. at 917-918. We are faced here with one of the most fundamental questions that can arise in a contract suit, namely: who is bound by this contract? To say that the courts and not the Board are solely entitled to pass upon contractual disputes and at the same time to deny the courts the power to determine in a fashion consistent with the policy of our national labor laws the identity of the persons or entities obligated by the contract is self-contradictory. If anything, the power to enforce a contract must necessarily include the ability to decide who is bound by the contract. No question is more basic to the existence of contractual rights. Thus to the extent that the identity of the obligees is bound up in representational issues, the federal courts must be empowered to decide those issues for the purpose of determining contractual rights and obligations.
 
 
 35
 Id. at 518 (emphasis added). Cf. Kaiser Steel v. Mullins, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982) (district court had jurisdiction to entertain unfair labor practice defense under Sec. 8(e) of the NLRA where necessary to resolve contract dispute).
 
 
 36
 In short, the Fifth Circuit held that under the narrow circumstances of Carpenters Local[7] the district court may decide the appropriateness of the bargaining unit when such a determination is essential to resolution of a genuine contractual claim. 690 F.2d at 517. In such a situation, federal court jurisdiction exists notwithstanding the availability of a unit determination by the NLRB if one of the parties filed an unfair labor practice charge or sought unit clarification. Id. at 519.
 
 
 37
 The holding in Carpenters Union does not ignore the holding of South Prairie. While South Prairie does have language to the effect that determination of the appropriate bargaining unit lies within the discretion of the NLRB, South Prairie was not an action to enforce a collective bargaining agreement under section 301. Arguably, South Prairie simply held that a court of appeals, in exercising its power to review decisions of an administrative body, should not presume to decide in the first instance issues within the authority of the agency to decide. Initial factual determinations in such situations should be made by the administrative tribunal. As Carpenter's Local points out, South Prairie need not apply in a section 301 action, at least where there is no previous or pending NLRB determination of the appropriateness of the bargaining unit. Id. at 513-21.
 
 
 38
 We find that the representational issue before us attaches to a genuine section 301 contract dispute as a collateral issue and that the case is not "so 'primarily representational' as to preclude section 301 jurisdiction." United Bhd. of Carpenters & Joiners of Am. v. W.T. Galliher Bros., Inc., 787 F.2d 953, 954 (4th Cir.1986) (citing International Bhd. of Elec. Workers v. Iowa Elec. Light & Power Co., 668 F.2d 413, 419 (8th Cir.1982)). See also International Union of Operating Eng'rs v. Superior Rigging, 602 F.Supp. 913, 917-18 (N.D.Ga.1984). A representational issue such as the relevant bargaining unit question facing us here, which happens to be subsumed in the determination of the respective rights of the parties under the contract, does not change the essentially contractual nature of this case.
 
 
 39
 In sum, we hold that section 301 confers upon this court the power to resolve representational issues essential to the adjudication of a contract claim, including those over which the NLRB has concurrent jurisdiction, at least where the same representational question is not pending before the NLRB or where the NLRB's jurisdiction has not been invoked with respect to the dispute between the parties. We, accordingly, determine that the federal courts can decide the relevant bargaining unit in the case before us, and we turn now to a review of the district court's decision on that issue.
 
 
 40
 B. Relevant Unit For Determining Union Support; Repudiation
 
 
 41
 The district court determined that the AGC was the proper unit for assessing Union status and that A & P had not shown that the Union did not enjoy majority status in that unit. As a result of A & P's assignment of its rights to the AGC, the court held that A & P could not repudiate the agreements as prehire agreements and was fully liable under them. We disagree, finding instead, for the reasons discussed below, that A & P was the relevant unit for determining union support. Therefore, since there was no Union majority status in A & P, the agreements remained repudiable prehire agreements.
 
 
 42
 The parties did not fully brief the threshold question of whether section 8(f) can be invoked after an employer has assigned its bargaining rights to an MEBU in which the majority of the employees are presumably represented by the Union. In turn, the district court did not elaborate on the reasoning underlying its conclusion that the MEBU was the relevant bargaining unit but merely cited McNeff v. Todd, 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983), and NLRB v. Tahoe Nugget, Inc., 584 F.2d 293 (9th Cir.1978), cert. denied, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 290 (1979), to support its holding. McNeff, however, simply stands for the proposition that a section 8(f) prehire agreement, prior to repudiation, is enforceable under section 301 against an employer by a union that has not established majority support in the relevant unit. McNeff, 461 U.S. at 266, 103 S.Ct. at 1756. The Court did not directly address the question of the relevant bargaining unit, although policy concerns raised by the Court suggest that the relevant unit would be the single employer. The two policy considerations discussed by the Court are (1) the workers' right to select their own bargaining representative and (2) Congress' intent that section 8(f) agreements be arrived at voluntarily and remain voidable. 461 U.S. at 268-69, 103 S.Ct. at 1757-58. Such concerns are not served by a conclusion that the MEBU, rather than A & P, is the unit in which majority status is measured. Such a conclusion would permit a construction industry employer unilaterally to determine the exclusive bargaining representative of its employees by signing a pact with an MEBU. The union party to the MEBU's collective bargaining agreement would then become the employees' sole representative whether or not it established majority status, and the agreement would become nonrepudiable. This result ignores Congress' intent under section 8(f) to carve out only a limited exception from the majority status requirement for collective bargaining and denies democratic choice to the workers. McNeff at 268-69, 103 S.Ct. at 1757-58.
 
 
 43
 McNeff also points out that "[o]ne factor prompting Congress to enact Sec. 8(f) was the uniquely temporary, transitory and sometimes seasonal nature of much of the employment in the construction industry. Congress recognized that construction industry unions often would not be able to establish majority support with respect to many bargaining units." Id. at 266, 103 S.Ct. at 1756. We read this statement as addressing and extending only to the McNeff determination that unions need not establish majority support in the relevant unit before attempting to enforce monetary obligations assumed by an employer under a prehire agreement.[8] The statement should not be read to prevent the employer from repudiating the agreement at any time prior to the union's establishment of majority support as to that employer, even in the case of a project-by-project employer such as A & P. See, e.g., Jordan & Nobles Constr. Co. v. New Mexico Dist. Council of Carpenters, 802 F.2d 1253 (10th Cir.1986); Painters Local Union No. 164 v. Epley, 764 F.2d 1509 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1636, 90 L.Ed.2d 182 (1986).
 
 
 44
 The district court also incorrectly extended the holding of NLRB v. Tahoe Nugget, Inc., 584 F.2d 293 (9th Cir.1978) to this case. Admittedly, the courts may imply majority union support among an employer's workforce when a non-construction employer joins an MEBU and continue to imply it after the employer leaves the MEBU. NLRB v. Tahoe Nugget, Inc.; see also NLRB v. Roger's I.G.A., Inc., 605 F.2d 1164 (10th Cir.1979) (once an employer has joined an MEBU, then a presumption of majority union support continues, until rebutted, even after withdrawal from the MEBU). However, this is not the case with a construction employer who can invoke section 8(f). Section 8(f) specifically permits an employer in the construction industry to enter into a prehire agreement when majority support for the union has not been established. 29 U.S.C. Sec. 158(f). The act of joining an MEBU does not imply or establish majority support among the employees of the individual employer, since such a finding would negate Congress' intent to allow repudiation of prehire bargaining agreements in the construction industry. See McNeff, 461 U.S. at 266-67, 103 S.Ct. at 1756-57 (citing NLRB v. Local 103, Int'l Ass'n of Bridge Workers (Higdon), 434 U.S. 335, 346, 98 S.Ct. 651, 658, 54 L.Ed.2d 586 (1978) (entering a prehire agreement does not make a union the representative of an employer's employees)). Nor can a presumption of continued majority support even after withdrawal arise in this case, since majority support was never shown to exist.
 
 
 45
 We find support for our position concerning the appropriate unit for determining union majority support in the Fifth Circuit's decision in Baton Rouge Bldg. & Constr. Trades Council v. E.C. Schafer Constr. Co., 657 F.2d 806 (5th Cir. Unit A Oct. 1981). In Schafer, the employer initially signed prehire agreements with the Carpenters', Operating Engineers', and Laborers' unions. Subsequently, the employer authorized an MEBU to represent it in future negotiations with the Carpenters' and Operating Engineers' unions. Upon failure of the employer to comply with the agreement negotiated by the MEBU, the Carpenters' Union brought suit for failure, among other things, to make required pension fund contributions. The Fifth Circuit, reversing the district court's decision that the employer had merged with the MEBU, held that absent employee assent, the employer's joining the MEBU could not ipso facto transform the employer's prehire agreements into collective bargaining agreements. The court stated:
 
 
 46
 The trial court concluded that the February 6 letter [MEBU authorization form] "effectively merged the company with the other member companies of the Associated General Contractors as one large bargaining unit. Thenceforth, it became irrelevant whether a majority of Schafer's employees favored the union so long as a majority of those employed by the Associated General Contractors were union people." Upon that "merger" into the multiemployer bargaining unit, the relevant unit for determination of union majority became that multiemployer workforce. Since there was no substantial doubt about the union sympathies of that larger body of workers, the prehire agreements thereby matured into collective bargaining agreements.
 
 
 47
 The district court's analysis assumes what is not the case; that an employer, by its action alone and without the acquiescence of its employees, can commit itself to membership in an MEBU.
 
 
 48
 657 F.2d at 810 (footnotes omitted). Implicit in that statement is the conclusion that the relevant unit for determining union majority support is the individual employer's workforce, not the multiemployer workforce. In the case of A & P, since there was no showing of union majority support in A & P, the agreements at issue were in reality prehire agreements with respect to A & P and remained subject to repudiation.
 
 
 49
 The Trustees in the case before us contend that Schafer 's rationale concerning the appropriate unit for determining majority support is invalid in light of McNeff. The Trustees cite an Eleventh Circuit case, Trustees of the Atlanta Ironworkers v. Southern Stress Wire Corp., 724 F.2d 1458 (11th Cir.1983), which concluded that McNeff overruled the Eleventh Circuit's result in Laborers Dist. Council v. McDowell Contractors, 680 F.2d 94 (11th Cir.1982) (per curiam), which had, in turn, relied on NLRB v. Haberman Const. Co., 641 F.2d 351 (5th Cir. Apr. 1981) (en banc ). Therefore, the argument goes, since Schafer relied on McDowell and Haberman, Schafer must have been overruled as well.
 
 
 50
 We disagree. First, we conclude that only the portion of Schafer relying on McDowell and Haberman was overruled by McNeff. Thus, only Schafer 's holding that majority status was a prerequisite to the enforcement by a union of prehire agreements is negated. Second, the Eleventh Circuit's determination in Southern Stress that its previous holding in McDowell (and, by implication, the Haberman decision) had been overruled by McNeff did not extend to the issue of the appropriate unit for determining majority support. Thus, the cases relied upon by the Trustees have no application to the issue before us. The Trustees simply ignore the dual aspects of Schafer and assume that because McNeff overruled McDowell and Haberman, which supported an unrelated aspect of the Schafer decision, somehow the related portion of Schafer was also overruled.
 
 
 51
 Finally, the Trustees' analysis fails to recognize that McNeff expressly permits an employer to repudiate a prehire agreement at any time prior to the establishment of majority support in the relevant unit. McNeff, 461 U.S. at 269, 103 S.Ct. at 1758. Where a construction employer desires to enter into agreements with a union under section 8(f), whether such construction industry employer joins an MEBU after signing a separate prehire agreement, as in Schafer, or does so without signing a separate prehire agreement, as in this case, does not change the union status of the employer's workforce. Therefore, where a union lacks majority support in that workforce, the employer retains the right to repudiate that agreement under section 8(f). Thus in our case, what may have been a true collective bargaining agreement between other members of the AGC and the Union was only a prehire agreement between A & P and the Union subject to repudiation under 8(f).
 
 
 52
 We conclude that the district court erred in determining that the appropriate unit for assessing union support was the AGC rather than A & P. Absent employee assent, we cannot accept the view that assignment of a construction employer's rights to an MEBU effects a "merger," transforming prehire agreements into nonrepudiable contracts on the basis of presumed union majority status in the multiemployer work force. See Schafer, 657 F.2d at 813. We therefore reverse that portion of the district court's decision.
 
 
 53
 Furthermore, we hold that the letters on or about November 14, 1980, disavowing any contract with the Union at seven specific worksites, constituted a repudiation on their face and, therefore, A & P is not liable for any payments under the contract after its repudiation.
 
 III.
 LACHES
 
 54
 The district court held that to establish the defense of laches, the defendant must show that the plaintiff had full knowledge of the facts and unreasonably delayed assertion of its rights, which caused prejudice to the defendant. Herald Co. v. Seawell, 472 F.2d 1081, 1099 (10th Cir.1972). The district court found that the Trustees did not have the requisite full knowledge of the facts because A & P filed false reports indicating no covered work. We cannot say that the district court's finding in this regard is clearly erroneous. Since A & P failed to establish an essential factor to its defense of laches, that defense must fail.IV.
 
 
 55
 "COVERED WORK"
 
 
 56
 The agreements between the AGC and the Union defined covered work as "all Ironworkers' work on or in all private and public building construction ... performed in the State of Colorado...." Plaintiff's Ex. 2 at 8; Plaintiff's Ex. 4 at 9. Article 2 of the agreements additionally defined covered work as "[a]ll work in connection with field fabrication and/or erection of structural, ornamental and reinforcing steel." Plaintiff's Ex. 2 at 3; Plaintiff's Ex. 4 at 2 (emphasis added). The special master found that the work covered "[a]ll outside ironwork performed by employees of the company during May, 1975 through December, 1980." Report of Special Master, R. Vol. I at 39. This included incidental services such as transportation and loading of materials
 
 
 57
 so long as the employee also did some outside ironwork at the time.... On the other hand, if the Company employee merely transported material to a job site, or merely loaded material at the shop or unloaded material at the job site, but did not then set beams, weld, roof deck, etc., the transportation, loading, or unloading function is found not to be within the scope of the collective bargaining agreements.
 
 
 58
 Id. The special master found the number of hours of covered work to be 27,929.5. The district court accepted both the special master's definition of covered work and his determination of the number of covered hours worked.
 
 
 59
 A & P contends that the special master's definition of covered work is erroneous, and that the erroneous definition led to an inflated determination of the hours of covered work performed. In particular, it argues that the Article 2 definition of covered work was intended to define the craft jurisdiction of the Union in relationship to other craft unions and did not exclude consideration of prevailing divisions of labor in the area. More specifically, it contended that other craft unions had traditionally performed some of the work claimed as "covered" by the Union.
 
 
 60
 With respect to these arguments, since the question is one of contractual interpretation and the agreements were unambiguous on their face, there is no need to turn to history and practice in the local industry to aid interpretation. And even if the Article 2 definition of covered work did not intend to exclude past agreements or practices with respect to divisions of work among conflicting craft jurisdictions, the Ironworkers' Union was the only union covered by the agreements with A & P. Therefore, there were no clashes of craft work jurisdictions at A & P during the period in question.[9]
 
 
 61
 We uphold the district court's ruling that the special master's decision on the scope of covered employment was correct and that his findings of fact were not clearly erroneous. Had A & P kept detailed records of the nature of the work performed, perhaps the special master would have been able to make a more refined calculation. A & P cannot now escape the consequences of its own failure to keep detailed records and to heed the agreement's definition of covered work.
 
 CONCLUSION
 
 62
 Given our determination that we have jurisdiction to decide the relevant bargaining unit in this contractual dispute, we hold that A & P Steel and not the AGC was the appropriate bargaining unit for assessment of majority status of the Union. Since the Union failed to establish majority support within A & P, the agreements remained voidable prehire agreements. A & P, however, remained fully liable for the terms of the agreements up until the time of repudiation. Since we also hold that A & P executed an effective repudiation on November 14, 1980, we remand this case to the district court for a redetermination of the damages awarded. We affirm the district court's ruling on all other issues.
 
 
 
 [1]
 The judgment also applied to the defendant bonding company, Western Casualty and Surety Company, to the extent of $3,000, which the district court ordered deducted from the judgment against A & P. Western Casualty is, therefore, affected by this appeal but is not an active participant
 
 
 [2]
 In its answer to the complaint A & P asserted as an affirmative defense that obligations in the agreements "are joint and mutual obligations and said union's failure to perform constitutes an excuse for performance by these defendants." R.Vol. I at 12. In the Joint Supplemental Pre-trial Order filed by the parties A & P stated as its claim on this subject: "(1) Plaintiffs, and Iron Workers Locals 24 and 750 had joint and mutual obligations to defendant A & P, and failure to perform excuses said defendant." R.Vol. I at 98
 
 
 [3]
 The Trustees assert that the legislative history of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by section 306(a) of the Multiemployer Pension Plan Amendments Act of 1980, Pub.L. 96-364, 94 Stat. 1295, to add section 515, 29 U.S.C. Sec. 1145 (1982), suggests a Congressional intent to narrow the scope of defenses available to an employer in suits by plan trustees to recover contractually required, but delinquent, contributions. See the discussion of this provision in Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 86-88, 102 S.Ct. 851, 861-62, 70 L.Ed.2d 833 (1982). As our discussion herein indicates, it is unnecessary for us to reach this argument
 
 
 [4]
 A & P criticizes the district court's failure to mention the testimony of Laura Gavoto, clerical secretary for the union, in its Findings of Fact. Brief for Appellant at 9 n. 5. However, the court did take her testimony into account in its opinion. R.Vol. I at 115. And, in any event A & P's arguments in this regard are inconsequential
 
 
 [5]
 The weakness of A & P's position in the light of evidence presented in the proceedings below is illustrated in its brief on appeal. It concedes that it "initially became a party to these agreements." Brief for Appellant at 4. Subsequently it states that its "position is that its obligation to make contributions, as established by the agreement, never materialized, or existed for only a limited time...." Id. at 16. It is clear that A & P itself cannot pinpoint in the evidence a time of alleged breach or frustration
 
 
 [6]
 For cases finding federal court jurisdiction over representational issues, see United Bhd. of Carpenters & Joiners of Am. v. W.T. Galliher & Bros., Inc., 787 F.2d 953 (4th Cir.1986); Carpenter's Local Union No. 1846 v. Pratt-Farnsworth, Inc., 690 F.2d 489 (5th Cir.1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); Int'l Union of Operating Eng'rs, Local 926 v. Superior Rigging & Erecting Co., 602 F.Supp. 913 (N.D.Ga.1984). See also Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 v. Celotex Corp., 708 F.2d 488, 490 n. 3 (9th Cir.1983)
 For cases where the courts have avoided ruling on the representational issue, see Northwest Adm'r Inc. v. Con Iverson, 749 F.2d 1338 (9th Cir.1984); Brotherhood of Teamsters, Local No. 70 v. California Consolidators, 693 F.2d 81 (9th Cir.1982) (per curiam), cert. denied, 469 U.S. 887, 105 S.Ct. 263, 83 L.Ed.2d 199 (1984); Local Union 204 of Int'l Bhd. of Elec. Workers v. Iowa Elec. Light & Power Co., 668 F.2d 413 (8th Cir.1982); Local No. 3-193, Int'l Woodworkers of Am. v. Ketchikan Pulp, 611 F.2d 1295 (9th Cir.1980). See also Local 705, Int'l Bhd. of Teamsters v. Willett, Inc., 614 F.Supp. 932 (N.D.Ill.1985).
 
 
 [7]
 The case did not involve an NLRB decision, either pending or final. Under other facts, the court indicates that its decision might have been different
 
 
 [8]
 Prior to McNeff, a body of law existed to the effect that a union could not enforce a prehire agreement against a project-by-project employer in the construction industry without first establishing majority support at each successive work site. See, e.g., NLRB v. Haberman Constr. Co., 641 F.2d 351 (5th Cir. Apr. 1981) (en banc); Dee Cee Floor Covering, Inc., 232 N.L.R.B. 421 (1977)
 
 
 [9]
 Previous to the 1975 agreement, A & P had bargaining agreements with many craft unions. After 1975 the only agreements in force were with the Ironworkers. How tasks were divided among several craft unions does not necessarily control the application of an agreement with a single craft union